786 A.2d 631

**Lawrence Michael BORCHARDT**

v.

**STATE of Maryland.**

**No. 55, Sept. Term, 2000.**

Court of Appeals of Maryland.

Dec. 13, 2001.

Reconsideration Denied
Jan. 4, 2002.

94

96

Argued by Fred Warren Bennett (Michael E. Lawlor of Bennett & Nathans, LLP, Greenbelt, on brief, Arcangelo M. Tuminelli, Baltimore, on brief), for appellant.

Argued by Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore for appellee.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

WILNER, Judge.

In May, 2000, appellant, Lawrence Borchardt, Sr. was convicted by a jury in the Circuit Court for Anne Arundel County of two counts each of premeditated first degree murder, first degree felony murder, and robbery with a deadly weapon. Those convictions emanated from the murder and robbery of Joseph and Bernice Ohler in their home in Baltimore County on November 26, 1998.[1] After a separate sentencing hearing, the jury imposed sentences of death for the murders of Mr. and Ms. Ohler. The court added a consecutive 20–year sentence for the armed robbery of Joseph Ohler and a concurrent 20–year sentence for the armed robbery of Bernice Ohler. In this appeal, Borchardt makes 10 complaints. We perceive no reversible error and shall therefore affirm the judgments of the Circuit Court.

---

1. Upon Borchardt's request for removal, the case was transferred for trial from Baltimore to Anne Arundel County.

### BACKGROUND

The evidence presented at trial was largely uncontradicted and was more than adequate to show that, in the course of a robbery, Borchardt murdered Mr. and Ms. Ohler. Borchardt and his girlfriend, Jeanne Cascio, lived about a mile from the Ohlers, along with Borchardt's son and the son's girlfriend, Tammy Ent. In order to help support his addiction to heroin, Borchardt, who was unemployed, would go door-to-door in the Golden Ring area of Baltimore County with Cascio, portraying her as cancer-afflicted and seeking donations to help pay for her treatment. On two previous occasions, Borchardt had been to the Ohler home, and Mr. Ohler had given him some money. On one occasion, Mr. Ohler drove Borchardt to a pharmacy, supposedly to pick up a prescription; in fact, Borchardt made a drug buy.

Mr. Ohler's body was discovered in his backyard on Thanksgiving night, November 26, by a neighbor. When the police arrived, they found Ms. Ohler's body inside the house. Both had died of multiple stab wounds. Also found in the house was a promissory note for $60 from Borchardt to Mr. Ohler, a social security card and a State welfare card in the name of Cascio, the handle of a knife, and jewelry scattered on the floor. A block away, the police found Mr. Ohler's wallet, along with keys, business and credit cards, a bloody coat, and bloody leather gloves, the left one showing a slice on the ring finger. After visiting Borchardt's apartment and speaking with his son, the police obtained arrest warrants for Borchardt and Cascio and a search warrant for Borchardt's apartment. In executing the search warrant, the police seized several bloody rags.

Borchardt and Cascio were arrested the next day, November 27. Borchardt had a cut on his left ring finger that corresponded to the slice found on the glove. He declined to talk with the police that day, claiming that he was suffering from drug withdrawal, but said that he would call them when he was ready to talk. He did so on December 9—twelve days later—at which time, after being advised of his rights, he gave

a seven-page written statement confessing to the murders. In that statement, Borchardt acknowledged that he needed money to buy drugs, that he went to the Ohler home and was admitted inside by Ms. Ohler, that he asked for $40 and was refused, that he then asked Ms. Ohler for some water and, while she was in the kitchen getting it, he took out his folding knife and stabbed Mr. Ohler five times, three times in the stomach and twice in the chest, that Ohler tried to escape but Borchardt knew he would not get far because of the way he was cut—his intestines were hanging out, that Borchardt then opened the desk in the hallway where he knew Mr. Ohler kept his wallet, that Ms. Ohler ran in and said that she had called the police, whereupon he stabbed her three times, aiming for the heart, that Mr. Ohler managed to get out of the door, and that Borchardt then left with the wallet, took $11 from it, and discarded the cards and keys. Borchardt added that, though wearing his fur-lined leather gloves, he had cut his finger with the knife and that he discarded the gloves as well. In addition to the written statement, Borchardt told the detectives that "he has a taste of blood now and he wants to keep killing whether it be inside or outside jail."

Borchardt's son confirmed that his father was unemployed and got money by asking for donations, using a collection box with Cascio's picture. He stated that, on Thanksgiving Day, Borchardt and Cascio left their home together, to "hustle money for some more [drugs]," and that they returned about 20 minutes later. After Cascio bandaged Borchardt's finger, they left the apartment because, according to Borchardt, he "had to stab a couple of people." The son identified the knife handle found in the Ohler home as part of one of Borchardt's knives. Several of the Ohlers' neighbors identified Borchardt as having come to their homes soliciting money on behalf of a woman needing treatment for cancer. Finally, DNA testing disclosed that Joseph Ohler could not be excluded as the source of blood found on Borchardt's jacket and shoes, although Borchardt, Cascio, and Ms. Ohler *were* excluded as the source. Borchardt, on the other hand, could not be excluded as the source of blood on the gloves found a block from the

Ohler home, whereas the Ohlers and Cascio were excluded as sources. One fingerprint found at the scene of the murders that was suitable for comparison was identified as that of Borchardt.

We shall recite other relevant facts in our discussion of the issues raised by Borchardt.

## *DISCUSSION*

### *Constitutionality of Death Penalty Law in Light of Apprendi v. New Jersey* [2]

#### (1) *The Maryland Capital Punishment Law*

Maryland Code, Article 27, § 412(b) provides that a person who is convicted of murder in the first degree and, at the time of the murder was at least 18 years old and not mentally retarded, "shall be sentenced to death, imprisonment for life, or imprisonment for life without the possibility of parole." Section 412(b) states further that the sentence shall be imprisonment for life unless (1) at least 30 days prior to trial the State notified the defendant that it intends to seek the death penalty and identified each aggravating circumstance upon which it intends to rely, and a sentence of death is imposed in accordance with § 413, or (2) at least 30 days prior to trial, the State notified the defendant that it intends to seek a sentence of imprisonment for life without parole.

Section 413 requires that, if the defendant is convicted of murder in the first degree and the State has given the requisite notice, a separate sentencing proceeding shall be held to determine whether the defendant shall be sentenced to death. That proceeding is to be conducted before (1) the jury that determined the defendant's guilt, (2) a jury impaneled for the purpose if (i) the defendant was convicted on a plea of guilty, (ii) the defendant was convicted by the court sitting without a jury, (iii) the jury that determined the defendant's guilt has been discharged for good cause, or (iv) review of an

---

2. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

earlier sentence of death has resulted in a remand for resentencing, or (3) the court, without a jury, if a jury proceeding is waived by the defendant. As Borchardt was sentenced by a jury—the one that convicted him—we shall refer to the sentencing tribunal as a jury, although, as noted, it may in other cases be a judge.

Section 413(d) lists 10 aggravating circumstances, any of which, if shown beyond a reasonable doubt to exist, may make a defendant potentially eligible for the death penalty. It is only those circumstances that the State had notified the defendant it intends to rely on that may actually be considered by the jury, however. The jury's first task under § 413(d), therefore, is to consider whether any of those circumstances relied upon by the State exist, beyond a reasonable doubt. In this instance, the State relied upon two such factors—that Borchardt committed more than one offense of murder in the first degree arising out of the same incident (No. 9), and that he committed the murders while committing or attempting to commit robbery (No. 10). Reliance on those circumstances also required the sentencing jury to determine, beyond a reasonable doubt, that Borchardt was a principal in the first degree. *See* § 413(e)(1)(i). If the jury does not find, beyond a reasonable doubt, that one or more of the enumerated aggravating circumstances exist, it must state that conclusion in writing, in which event a sentence of death may not be imposed. *See* § 413(f). If, on the other hand, the jury finds that one or more of those aggravating circumstances *do* exist, it must then consider and determine, by a preponderance of the evidence, whether there exist any of seven enumerated mitigating circumstances or "[a]ny other facts which the jury ... specifically sets forth in writing that it finds as mitigating circumstances in the case." § 413(g). By case law, we have construed that eighth, catch-all, factor to include " 'anything relating to the defendant or to the crime which causes [the jury or any of its individual members] to believe that death may not be appropriate.' " *Ware v. State,* 360 Md. 650, 690, 759 A.2d 764, 785 (2000), *cert. denied,* 531 U.S. 1115, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001) (quoting *Harris v. State,* 312 Md. 225,

253, 539 A.2d 637, 651 (1988), quoting, in turn, *Mills v. State,* 310 Md. 33, 51, 527 A.2d 3, 11 (1987), *judgment vacated on other grounds,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)) (alteration in original).

The *Apprendi* issue posited by Borchardt arises from § 413(h), dealing with the weighing of aggravating and mitigating circumstances. That section provides that, if the jury finds that one or more mitigating circumstances exist, "it shall determine whether, *by a preponderance of the evidence,* the aggravating circumstances outweigh the mitigating circumstances." (Emphasis added). If the jury finds that they do, the sentence is death; if it finds that the aggravating circumstances do not outweigh the mitigating circumstances, a sentence of death may not be imposed. The ultimate determination must be unanimous and in writing. *See* § 413(i). Borchardt contends that, under *Apprendi,* due process requires a determination that the aggravating circumstances outweigh any mitigating circumstances to be made beyond a reasonable doubt and not by a mere preponderance of evidence.

Section 414, as supplemented by Maryland Rule 8–306, provides for automatic appellate review by this Court whenever the death penalty is imposed. In addition to considering any errors alleged by the defendant, we are required by § 414(e) to consider the imposition of the death sentence itself, including (1) whether the sentence was imposed under the influence of passion, prejudice, or other arbitrary factor, (2) whether the evidence supports the jury's finding of a statutory aggravating circumstance under § 413(d), and (3) whether "the evidence supports the jury's or court's finding that the aggravating circumstances outweigh the mitigating circumstances."

## (2) *Apprendi and its Antecedents*

*Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) was a five-four decision that produced five separate opinions and a great deal of controversy. *See,* for example, Apprendi *Symposium,* 38 AM.CRIM. L.REV. 241

(2001). It was not a death penalty case, it did not involve a capital punishment sentencing scheme, and the five Justices forming the majority made clear their view that the rulings enunciated in the case did *not* serve to invalidate any capital punishment laws. Borchardt nonetheless urges that the case has precisely that effect.

Ultimately, of course, it is the Supreme Court that will have to determine the impact of its *Apprendi* decision on the various capital punishment laws enacted by Congress and the States. We can do no more than examine what the Court said, in the context of the issue before it and the earlier decisions that it cited and discussed. That examination convinces us that *Apprendi* does *not* render § 413(h) or any other part of the Maryland capital punishment law unconstitutional.

To appreciate the import of *Apprendi,* we need to begin with several earlier cases, the first being *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The *Winship* Court made clear that the reasonable doubt standard for determining guilt in a criminal (or juvenile delinquency) case, long established under common law tradition, was required also as an aspect of Constitutional due process. The Court explained that the reasonable doubt standard "is a prime instrument for reducing the risk of convictions *resting on factual error* " and that it "provides concrete substance for the presumption of innocence . . . ." *Id.* at 363, 90 S.Ct. at 1072, 25 L.Ed.2d at 375 (emphasis added). Its express holding was that the due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt *of every fact necessary to constitute the crime with which he is charged."* *Id.* at 364, 90 S.Ct. at 1073, 25 L.Ed.2d at 375 (emphasis added).

In *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the Court applied *Winship* to hold unconstitutional a Maine statute that presumed malice aforethought from an intent to kill and required a defendant charged with murder who sought to reduce the homicide to manslaughter to bear the burden of proving, by a preponderance of the evi-

dence, that he acted in the heat of passion or with sudden provocation. In seeking to distinguish *Winship,* Maine urged that the absence of heat of passion or sudden provocation was not a "fact" necessary to the crime of felonious homicide. The Court rejected that argument, noting the importance of the differing degrees of culpability between murder and man-slaughter and holding that, if *Winship* were limited to only those facts that constitute a crime as defined by State law, a State could undermine many of the interests of that decision by simply redefining the elements that constitute different crimes as factors bearing only upon punishment. *Winship,* the Court said, was concerned with substance and not "this kind of formalism." *Id.* at 699, 95 S.Ct. at 1890, 44 L.Ed.2d at 519.

In *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Court dispelled some of the suppositions that lower courts had drawn from *Mullaney* and sustained, against an attack based on *Winship* and *Mullaney,* a requirement of New York law that a statutory affirmative defense to the crime of second degree murder be established by the defendant, by a preponderance of the evidence. The attack, essentially, was on any scheme that required the defendant to prove a fact that would lessen or mitigate criminality, that relieved the State of having to negate the existence of that fact beyond a reasonable doubt. Limiting the breadth of *Mullaney,* the Court declined to adopt as a constitutional imperative "that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused," leaving it, rather, to the State legislatures to allocate the burden of establishing such defenses. *Id.* at 210, 97 S.Ct. at 2327, 53 L.Ed.2d at 292. The Court concluded that, subject to some undefined Constitutional limits, if the State "chooses to recognize a factor that mitigates the degree of criminality or punishment, we think the State may assure itself that the fact has been established with reasonable certainty." *Id.* at 209, 97 S.Ct. at 2326, 53 L.Ed.2d at 291. It declined to read *Mullaney* as holding "that the State may not permit the

blameworthiness of an act or the severity of punishment authorized for its commission to depend on the presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact ... beyond a reasonable doubt." *Id.* at 214–15, 97 S.Ct. at 2329, 53 L.Ed.2d at 294–95.

*Patterson* was a prelude to *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), which was cited extensively in *Apprendi.* In *McMillan,* the Court found no Constitutional defect in a Pennsylvania statute that subjected a person convicted of certain felonies to a mandatory minimum prison sentence of five years if the sentencing judge found, by a preponderance of evidence, that the defendant "visibly possessed a firearm" during the commission of the offense. McMillan's argument was that visible possession of a firearm was an element of the offense itself and, under *Winship* and *Mullaney,* had to be proved beyond a reasonable doubt.

The statute in question specifically provided that visible possession of a firearm was not an element of the underlying offense, and the Court was content to accept that legislative judgment. The Court noted that the statute before it neither altered the maximum sentence available for the enumerated offenses nor created any separate offense calling for a separate penalty but merely operated "to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding of visible possession of a firearm" by "raising to five years the minimum sentence which may be imposed within the statutory plan." *Id.* at 88, 106 S.Ct. at 2417, 91 L.Ed.2d at 77. Although acknowledging that some States had made possession of a weapon an element of various aggravated offenses, the Court found it permissible for Pennsylvania to adopt a different approach and regard such possession as merely a sentencing factor. Citing *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Court noted that sentencing courts necessarily consider the circumstances of an offense in selecting the appropriate punishment, and that it had "consistently approved sentencing schemes that mandate consideration of

facts related to the crime." *McMillan*, 477 U.S. at 92, 106 S.Ct. at 2419, 91 L.Ed.2d at 80. On those bases, the Court found no Constitutional violation, either of due process or the Sixth Amendment right to jury trial, in the judge making the requisite finding by a mere preponderance of the evidence. The Court noted, in the course of its opinion, that the law in question did not subject the defendant to any greater punishment than was attached to the offense generally and that McMillan's claim "would have at least more superficial appeal if a finding of visible possession exposed [him] to greater or additional punishment." *Id.* at 88, 106 S.Ct. at 2417, 91 L.Ed.2d at 78.

The next important case in the chain leading to *Apprendi* is *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), a case of special significance because it *did* involve an attack on a capital punishment law and was the product of much discussion in the *Apprendi* opinions. Under Arizona law, after a defendant was convicted of first degree murder, a separate sentencing proceeding was held before a judge to determine whether the sentence should be death or life imprisonment. The judge was directed to determine the existence or non-existence of any of the aggravating or mitigating circumstances set forth in the statute. The burden of proving an aggravating factor was on the State; the burden of proving a mitigating factor was on the defendant. The judge was directed to return a special verdict setting forth his or her findings as to aggravating and mitigating circumstances and then impose a sentence of death if the judge found one or more aggravating circumstances "and that there are no mitigating circumstances sufficiently substantial to call for leniency." *Id.* at 644, 110 S.Ct. at 3052, 111 L.Ed.2d at 522. Upon the imposition of the death penalty, the Arizona Supreme Court was required to conduct an independent review of the sentence to ensure that aggravating factors were proven beyond a reasonable doubt and all appropriate mitigation was considered.

Among the arguments made by Walton, who was convicted and sentenced to death pursuant to that procedure, was "that

every finding of fact underlying the sentencing decision must be made by a jury, not by a judge." *Id.* at 647, 110 S.Ct. at 3054, 111 L.Ed.2d at 524. The Court noted that, in prior decisions, it had "soundly rejected" the argument "that the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence." *Id.* (quoting *Clemons v. Mississippi,* 494 U.S. 738, 745, 110 S.Ct. 1441, 1446, 108 L.Ed.2d 725, 736 (1990) and citing as well *Hildwin v. Florida,* 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989), *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), and *Proffitt v. Florida, supra,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913). The Court found no persuasive distinction between the Florida approach, where the jury merely recommended a sentence to the judge but made no specific factual findings with regard to the existence of aggravating or mitigating circumstances, and the Arizona law. Nor did the Court find merit in Walton's contention that, under the Arizona approach, aggravating circumstances constituted elements of the offense rather than sentencing considerations. In that regard, the Court iterated its statement from *Poland v. Arizona,* 476 U.S. 147, 156, 106 S.Ct. 1749, 1755, 90 L.Ed.2d 123, 132–33 (1986):

"Aggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts of death and life imprisonment. Thus, under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself 'convict' a defendant (*i.e.,* require the death penalty), and the failure to find any particular aggravating circumstance does not 'acquit' a defendant (*i.e.,* preclude the death penalty)."

*Walton,* 497 U.S. at 648, 110 S.Ct. at 3054, 111 L.Ed.2d at 525.

In *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the Court considered the interplay between two provisions in a Federal statute—one, 8 U.S.C. § 1326(a), making it a crime, punishable by up to two years in prison, for a deported alien to return to the United States without permission, and another, § 1326(b) authorizing

a prison term of 20 years if the deportation followed a conviction for an aggravated felony. The indictment against the defendant referenced § 1326 generally but made no allegation that he had been deported following conviction of an aggravated felony. The issue articulated by the Court was whether § 1326(b), enacted 36 years after § 1326(a), defined a separate crime or simply authorized an enhanced penalty, for, if it defined a separate crime, the element of a prior conviction for aggravated felony would have to be alleged in the indictment. The Court characterized § 1326(b) as a recidivist provision which, in its view, was "as typical a sentencing factor as one might imagine." *Id.* at 230, 118 S.Ct. at 1224, 140 L.Ed.2d at 359. As a matter of statutory construction, the Court found, for various reasons, that the intent of Congress was not to make the aggravating factor in § 1326(b) an element of a separate offense.

The Court turned, then, to whether, under *Winship* and *Mullaney,* it was an element as a matter of Constitutional law. *Winship* the Court found irrelevant and, to the extent language in *Mullaney* might support the defendant's position, it had been circumscribed in *Patterson,* which the Court regarded as requiring "scarcely any sentencing factors" to be treated as elements of the offense. *Id.* at 241, 118 S.Ct. at 1229, 140 L.Ed.2d at 366. Though noting a distinction between the case at hand, where the second statute increased a maximum penalty, and *McMillan,* where the statute under attack created a mandatory minimum sentence, the Court regarded that distinction as favorable to the defendant and therefore not requiring a different result. In closing, the Court noted that, because the defendant had conceded his prior conviction for an aggravated felony, he made no separate argument concerning the standard of proof applicable to the aggravating factor, and it therefore expressed no view on "whether some heightened standard of proof might apply to sentencing determinations that bear significantly on the severity of sentence." *Id.* at 248, 118 S.Ct. at 1233, 140 L.Ed.2d at 371.

The common issue in these cases was whether, from a Constitutional perspective, a fact that, if shown to exist or not

exist, might or would increase or decrease either the degree of criminality or punishment, constituted an element of the offense charged. That issue was dealt with in four different, though obviously related, contexts: who had the burden of persuasion in the matter, the standard of proof applicable to establishing the fact, whether a dispute over the fact was for the trier of fact to resolve or could be resolved by the judge alone as a sentencing factor, and whether the fact had to be alleged in the charging document. Those contexts came together in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), the most pertinent precursor to *Apprendi.*

*Jones* involved the Federal carjacking statute, 18 U.S.C. § 2119, which, in a stem paragraph defined the conduct constituting the offense and then provided, in three further paragraphs, that (1) the offender was subject to imprisonment for up to 15 years, (2) if serious bodily injury resulted, the offender was subject to imprisonment for up to 25 years, and (3) if death resulted, the offender was subject to imprisonment for life. The indictment against Jones mentioned § 2119 generally but did not charge that any serious injury resulted and did not mention § 2119(2). At arraignment, he was told that he faced a penalty of 15 years. A pre-sentence report filed after his conviction recommended a sentence of 25 years because serious injury resulted to one of the victims whereupon, over Jones's objection, the judge found the existence of serious injury and imposed a sentence of 25 years. The specific issue before the Supreme Court was whether the statute effectively created three separate offenses, thereby making the existence of serious injury or death elements of an offense, or, conversely, those facts were merely sentencing considerations. The Court noted at the outset that "[m]uch turns on the determination that a fact is an element of an offense rather than a sentencing consideration, given that elements *must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." Id.* at 232, 119 S.Ct. at 1219, 143 L.Ed.2d at 319 (emphasis added).

After analyzing the text and structure of the statute and considering both its legislative history and how Congress had treated the consequence of serious injury or death in other statutes, the Court concluded, as a matter of statutory construction, that the intent of Congress was to create separate offenses and not to make serious injury or death merely sentencing considerations. In support of that conclusion, the Court observed that a contrary construction would raise serious Constitutional issues and that it was obliged to construe the statute to avoid that problem.

The significance of *Jones*, in contrast to *Castillo v. United States,* 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000) (reaching a similar conclusion based solely on statutory construction regarding 18 U.S.C. § 924(c)(1), prohibiting the use of firearms in the commission of a crime of violence), lies in the Court's explanation of the Constitutional concerns that would flow from regarding the additional facts as simply sentencing considerations. The concern most prominently addressed emanated from the Sixth Amendment right of jury trial. Noting its prior admonitions that there were limits on the State's (and Congress's) ability to define facts serving to increase criminality or punishment as sentencing considerations, the Court observed that, if a potential penalty might rise from 15 years to life based on a non-jury determination, the role of the jury would be significantly diminished: "The point is simply that diminishment of the jury's significance by removing control *over facts determining a statutory sentencing range* would resonate with the claims of earlier controversies, to raise a genuine Sixth Amendment issue not yet settled." *Jones,* 526 U.S. at 248, 119 S.Ct. at 1226, 143 L.Ed.2d at 329 (emphasis added).

The Court's discussion of Constitutional issues, as noted, was solely in the context of its statutory construction analysis, and it took pains to announce that its decision did "not announce any new principle of constitutional law, but merely interprets a particular federal statute in light of a set of constitutional concerns that have emerged through a series of our decisions over the past quarter century." *Id.* at 251 n. 11,

119 S.Ct. at 1228 n. 11, 143 L.Ed.2d at 331 n. 11. It nonetheless restated its view, from the earlier cases, that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) *that increases the maximum penalty for a crime* must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 243 n. 6, 119 S.Ct. at 1224 n. 6, 143 L.Ed.2d at 326 n. 6 (emphasis added).

Having ventured into the Constitutional realm, the Court expressly noted several cases dealing with fact-finding in capital punishment cases that permitted a level of fact-finding to be made by the judge, rather than the jury, but did not regard them as pertinent. In *Walton,* it said, "[t]he Court . . . characterized the finding of aggravating facts falling within the traditional scope of capital sentencing as a choice between a greater and a lesser penalty, not as a process of raising the ceiling *of the sentencing range available." Id.* at 251, 119 S.Ct. at 1228, 143 L.Ed.2d at 331 (emphasis added). That point was made as well in the concurring opinions of Justices Stevens and Scalia, both of whom noted their Constitutional concern over removing from the jury the assessment of facts that increase "the prescribed range of penalties to which a criminal defendant is exposed." *Id.* at 252, 119 S.Ct. at 1228, 143 L.Ed.2d at 332 (concurring opinion by Stevens, J.) and at 253, 119 S.Ct. at 1229, 143 L.Ed.2d at 332 (concurring opinion by Scalia, J.).

This brings us to *Apprendi,* in which the defendant was convicted, on a plea of guilty, of using a firearm for an unlawful purpose, a second-degree offense under New Jersey law that carried a sentence range of five to ten years in prison. There was evidence, which Apprendi disputed, that his offense was racially motivated—that he fired shots into the home of an African–American family because he did not want them as neighbors. New Jersey had a separate "hate crime" statute that increased the punishment for a second-degree offense to a prison term of 10 to 20 years if the judge found, by a preponderance of the evidence, that the defendant committed

the underlying offense with a purpose to intimidate an individual or group because of race, color, gender, handicap, religion, sexual orientation, or ethnicity. Apprendi was not charged under the hate crime law, and, though pleading guilty to the underlying offense, he objected to the sentence enhancement under that law. The judge rejected the challenge and sentenced Apprendi to 12 years.

The Supreme Court believed that the case was controlled by the footnote statement made in *Jones*—that under the 14th Amendment (as under the Fifth and Sixth, which applied to the Federal prosecution in *Jones* ) "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi,* 530 U.S. at 476, 120 S.Ct. at 2355, 147 L.Ed.2d at 446 (quoting from *Jones,* 526 U.S. at 243 n. 6, 119 S.Ct. at 1224 n. 6, 143 L.Ed.2d at 326 n. 6). Consistently with that statement, it announced its holding:

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule set forth in the concurring opinions in [*Jones* ]: '[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.' 526 U.S. at 252–53, 119 S.Ct. 1215 (opinion of STEVENS, J.); see also 526 U.S. at 253, 119 S.Ct. 1215 (opinion of SCALIA, J.)."

*Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d at 455 (emphasis added).

Against that standard, the Court determined that the enhanced penalty imposed by the hate crime statute was not merely a sentencing consideration but effectively "turn[ed] a second-degree offense into a first-degree offense, under the

State's own criminal code" (*id.* at 494, 120 S.Ct. at 2365, 147 L.Ed.2d at 457) and therefore constituted "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system." *Id.* at 497, 120 S.Ct. at 2366, 147 L.Ed.2d at 459. The Court made clear, however, that it was not impermissible "for judges to exercise discretion— taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute" and noted that judges have long "exercised discretion of this nature in imposing sentence *within statutory limits* in the individual case." *Id.* at 481, 120 S.Ct. at 2358, 147 L.Ed.2d at 449 (emphasis in original).

The impact of the argument made by Apprendi on capital sentencing laws—at least those that allow the judge to determine and weigh aggravating and mitigating factors—was clearly of concern to both the litigants and the Court. Amicus briefs filed by the United States and the Anti Defamation League cited *Walton* and the cases approving the Florida capital punishment scheme as authority for treating the racial motive as a sentencing consideration properly determined by a judge, and the issue was raised by several of the Justices at oral argument.

In response, the Court, citing *Walton,* expressly noted in its opinion that it "has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death." *Id.* at 496, 120 S.Ct. at 2366, 147 L.Ed.2d at 459. In explanation of why the capital cases were not controlling on the issue before it, the Court, quoting from the dissenting opinion filed by Justice Scalia in *Almendarez– Torres v. United States, supra,* 523 U.S. at 257 n. 2, 118 S.Ct. at 1237 n. 2, 140 L.Ed.2d at 377 n. 2, stated that those cases do not permit a judge "to determine the existence of a factor which makes a crime a capital offense" but hold only that "once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the

sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed." *Apprendi,* 530 U.S. at 497, 120 S.Ct. at 2366, 147 L.Ed.2d at 459.

### (3) *Post–Apprendi Cases*

Not surprisingly, despite the Supreme Court's unambiguous attempt to distance its death penalty jurisprudence from the rulings enunciated in *Jones* and *Apprendi,* efforts have been made throughout the country to use those cases—*Apprendi* in particular—to impale capital punishment laws. All such efforts, to date, have been unsuccessful.

In *Burch v. Corcoran,* 273 F.3d 577 (4th Cir.2001), the U.S. Court of Appeals for the Fourth Circuit had before it the very issue raised here by Borchardt—whether the preponderance of evidence standard mandated by § 413(h) for the weighing process made the Maryland capital sentencing procedure invalid under *Apprendi.* Although the court held that Burch's failure to raise that issue in earlier State proceedings precluded consideration of it by the Federal court in a habeas corpus action, the court made clear that,

"[e]ven if we could address the merits of Burch's claim that *Apprendi* renders Maryland's capital punishment sentencing provisions unconstitutional, his contention would fail. In explaining the basis and reach of *Apprendi,* Justice Stevens rejected the notion that *Apprendi* rendered state death-penalty statutes unconstitutional [citation omitted].

Burch was convicted of two counts of first-degree murder at the guilt phase of his state court trial in Maryland. Each element of those capital crimes was proven to the jury beyond a reasonable doubt. When the sentencing jury, pursuant to the provisions of section 413(h) of the Maryland Code, determined by a preponderance of the evidence that the aggravating circumstances outweighed the mitigating circumstances and that therefore a death sentence was warranted, it was simply selecting the appropriate sentence from a range of penalties that already included the death penalty. As such, Burch's sentence of death did not violate

*Apprendi* because every fact necessary to the capital murder charges already had been 'submitted to a jury, and proved beyond a reasonable doubt.' "

*Id.* at 584 n. 6 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 2363, 147 L.Ed.2d 435, 455 (2000)).

In *State v. Hoskins*, 199 Ariz. 127, 14 P.3d 997 (2000), *cert. denied*, —— U.S. ——, 122 S.Ct. 386, 151 L.Ed.2d 294 (2001), the defendant contended that the Arizona death penalty law was unconstitutional because it eliminated jury consideration in the sentencing process. The court dismissed the challenge on the basis of *Walton*. It indicated its awareness of *Apprendi*, *Castillo*, and *Jones*, but observed that none of them involved capital punishment and concluded that it would continue to follow *Walton* until such time as the Supreme Court expressly overruled it. *See also State v. Ring*, 200 Ariz. 267, 25 P.3d 1139, 1150-52 (2001), *petition for cert. filed*, Sept. 18, 2001 (holding to the same effect); *People v. Ochoa*, 26 Cal.4th 398, 110 Cal.Rptr.2d 324, 28 P.3d 78, 86-87 (2001) (applying *Walton* and specifically rejecting application of *Apprendi* in capital cases). In *People v. Anderson*, 25 Cal.4th 543, 106 Cal.Rptr.2d 575, 22 P.3d 347 (2001), the defendant made two complaints implicating *Apprendi*, one being precisely the argument made here by Borchardt. Anderson argued that the California death penalty law was unconstitutional because it did not require "(3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." *Id.* 106 Cal.Rptr.2d 575, 22 P.3d at 386. Though clearly aware of *Apprendi*, the court rejected that challenge based on its earlier case law. Anderson also complained that the trial court failed, *sua sponte*, to instruct the jury on the substance of the crimes of murder and robbery, used as an aggravating factor. The court found no merit in that argument either, noting that it was not persuaded otherwise by *Apprendi*. In that regard, it concluded:

"[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true

beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole.... Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi.*" *Id.* 106 Cal.Rptr.2d 575, 22 P.3d at 378 n. 14 (citation omitted).

In *Weeks v. State,* 761 A.2d 804 (Del.2000), the defendant, in a post conviction proceeding, claimed that Delaware's capital punishment law was unconstitutional under *Apprendi* because it allowed the judge to find a statutory aggravating factor without being bound by a jury verdict on allegedly underlying issues of fact. Quoting from *Apprendi,* itself, the court responded that it was "not persuaded that *Apprendi's* reach extends to 'state capital sentencing schemes' in which judges are required to find 'specific aggravating factors before imposing a sentence of death.'" *Weeks,* 761 A.2d at 806 (quoting *Apprendi,* 530 U.S. at 496, 120 S.Ct. at 2366, 147 L.Ed.2d at 459).

A similar holding was made in *Mills v. Moore,* 786 So.2d 532 (Fla.), *cert. denied,* 532 U.S. 1015, 121 S.Ct. 1752, 149 L.Ed.2d 673 (2001). There, too, a defendant who received the death penalty challenged, in a habeas corpus proceeding, the constitutionality of the Florida statute to the extent that it allowed a judge to find specific aggravating factors. The court observed that "[n]o court has extended *Apprendi* to capital sentencing schemes, and the plain language of *Apprendi* indicates that the case is not intended to apply to capital schemes." *Id.* at 537. Relying on comments made in Justice O'Connor's dissenting opinion and Justice Thomas's concurring opinion in *Apprendi,* Mills urged that *Apprendi* had, indeed, overruled *Walton,* to which the Florida court responded that the majority had not overruled *Walton* and, citing *Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391, 423 (1997), made clear that it was not for the Florida court to do so. The court held that the majority opinion in *Apprendi* "preserves the constitutionality of capital sentencing schemes like Florida's." *Mills,* 786 So.2d at 537.

In North Carolina, the State is not obliged to inform the defendant prior to trial of the aggravating circumstances upon which it intends to rely. In *State v. Golphin*, 352 N.C. 364, 533 S.E.2d 168 (2000), *cert. denied*, 532 U.S. 931, 121 S.Ct. 1379, 149 L.Ed.2d 305 and 532 U.S. 931, 121 S.Ct. 1380, 149 L.Ed.2d 305 (2001), a defendant sentenced to death complained that the failure to allege those aggravating factors in the indictment made the law unconstitutional under *Apprendi*. The court rejected that complaint, holding that *Apprendi* did not affect its prior holdings that those factors did not need to be alleged in the indictment. *See also State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428, 438 (2000), *cert. denied*, 531 U.S. 1130, 121 S.Ct. 890, 148 L.Ed.2d 797 (2001) (rejecting argument that short-form indictment for murder authorized under North Carolina law was unconstitutional under *Apprendi* and *Jones* because it did not specifically allege premeditation, deliberation, and intent to kill), and *State v. King*, 353 N.C. 457, 546 S.E.2d 575, 585 (2001) (same).

The Missouri Supreme Court rejected an *Apprendi* challenge in *State v. Storey*, 40 S.W.3d 898 (Mo.), *cert. denied*, —— U.S. ——, 122 S.Ct. 272, 151 L.Ed.2d 199 (2001). Storey, whose previous death sentences had been set aside, averred that, in one of the earlier proceedings, the jury had failed to find the aggravating factor that the murder was committed for pecuniary gain, and he complained, on double jeopardy grounds, about the submission of that factor in the proceeding on remand. Although in *Poland v. Arizona, supra*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123, the Supreme Court had rejected that kind of argument, Storey contended that *Jones* and *Apprendi* suggested that the Court had begun to reexamine the application of double jeopardy to sentencing. The court disposed of that argument with the statement that "[t]o the contrary, the *Apprendi* Court specifically rejected the contention that its ruling had any effect on the finding of aggravating factors in capital cases." *Id.* at 915. *Accord People v. Ochoa, supra*, 110 Cal.Rptr.2d 324, 28 P.3d at 86–87.

Several Federal courts have reached a similar conclusion. In *United States v. Allen*, 247 F.3d 741, 759 n. 5 (8th Cir.2001),

the court rejected a number of *Apprendi* challenges to the Federal Death Penalty Act, including complaints that statutory and non-statutory aggravating factors should have been presented to the grand jury and alleged in the indictment. The court's response was that those aggravating factors were not elements of the offense and did not serve to increase the penalty beyond the statutory maximum. *See also United States v. Bin Laden*, 126 F.Supp.2d 290, 296 n. 6 (S.D.N.Y. 2001) and *United States v. Nichols*, 132 F.Supp.2d 931 (D.Colo.), *aff'd by unreported opinion*, No. 99–1438, 2000 WL 1846225, 2000 U.S.App. Lexis 33183 (10th Cir.), *cert. denied*, 532 U.S. 985, 121 S.Ct. 1632, 149 L.Ed.2d 493 (2001).

The Court of Appeals for the Ninth Circuit, in a Federal habeas corpus proceeding, dealt with the same issue presented to the Florida court in *Mills v. Moore, supra*, 786 So.2d 532, and arrived at the same conclusion—that the Idaho capital punishment law was not unconstitutional under *Apprendi* because it allowed the judge to determine the existence of aggravating circumstances. *See Hoffman v. Arave*, 236 F.3d 523 (9th Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 323, 151 L.Ed.2d 241 (2001). Though noting the *Apprendi* dissenters' concern that the ruling may have implicitly overruled *Walton*, the court observed that "[t]he Supreme Court has specifically directed lower courts to 'leav[e] to this Court the prerogative of overruling its own decisions' " and that it was not the court of appeals's place "to engage in anticipatory overruling." *Id.* at 542 (quoting *Agostini v. Felton, supra*, 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391, 423).

In the face of this solid block of cases, from six State Supreme Courts and three Federal appellate courts, Borchardt urges us to follow the decision of an intermediate appellate court panel in Illinois that did not involve the death penalty. In *People v. Nitz*, 319 Ill.App.3d 949, 254 Ill.Dec. 281, 747 N.E.2d 38 (2001), the defendant was charged with non-capital murder under a statute that provided a maximum penalty of 60 years in prison unless the judge found that the killing was accompanied by brutal or heinous behavior, in which event, the maximum penalty was life imprisonment.

The trial judge found that circumstance to exist and imposed a life sentence. Holding that the judge's factual finding "expose[d] Nitz to a greater punishment than that authorized by the jury's guilty verdict," the appellate court found the sentence invalid under *Apprendi* and modified it to 60 years. *Id.* 254 Ill.Dec. 281, 747 N.E.2d at 54. *But see People v. Ford,* 198 Ill.2d 68, 260 Ill.Dec. 552, 761 N.E.2d 735 (2001) (upholding enhanced sentence of 100 years based on finding by sentencing judge, on a standard less than beyond a reasonable doubt, that murder was accompanied by wanton cruelty). Apart from the non-pertinence of *Nitz* to the issue before us, it appears that the question addressed in that case may have been resolved in a different way by the Illinois Supreme Court.[3]

---

**3.** It appears that, under the Illinois law applied in *Ford,* a person convicted of murder in the first degree was subject to a penalty ranging from 20 years in prison to death. Absent a finding of aggravating circumstance, the penalty was from 20 to 60 years. If the trier of fact found at least one aggravating factor, an "extended" sentence of up to 100 years was permissible. The death sentence was permissible only if an aggravating factor was found beyond a reasonable doubt and was not outweighed by any mitigating factors. In *Ford,* after the defendant was convicted of murder in the first degree, the trial judge found, beyond a reasonable doubt, two aggravating factors that made him death-eligible. The judge found a number of mitigating factors, however, and, as a result, declined to impose the death sentence. By a preponderance, he found a different aggravating factor—that the crime was accompanied by wanton cruelty—and, on that basis, imposed the "extended" term of 100 years.

As did Nitz, Ford argued that the 100–year sentence was unlawful under *Apprendi* because the predicate finding of wanton cruelty was made on a mere preponderance. The Illinois Supreme Court affirmed, holding that the fact that the critical finding was not made beyond a reasonable doubt was "immaterial," and that *"Apprendi* requires only those facts that increase the penalty for a crime *beyond the prescribed statutory maximum* be proved beyond a reasonable doubt." *Id.* at 73, 260 Ill.Dec. 552, 761 N.E.2d 735 (emphasis in original).

There would seem to be two possible bases on which the court reached its conclusion sustaining the 100–year sentence—one that *Apprendi* was inapplicable and the other that *Apprendi* was applicable but satisfied—but the opinion does not make entirely clear which one the court used. The court may tacitly have treated the trial judge's decision not to impose the death sentence, based on the mitigating factors, as returning Ford to a maximum 60–year sentence and concluded, nonetheless, that *Apprendi* did not require that the additional

### (3) *Analysis*

■ The issue of whether § 413(h) violates due process by excusing the State from the burden of proving, beyond a reasonable doubt, that the aggravating circumstances found by the jury outweigh any mitigating circumstances it finds to exist has been resolved by this Court on numerous occasions, beginning with *Tichnell v. State,* 287 Md. 695, 729–34, 415 A.2d 830, 848–50 (1980), and ending, most recently, in *Ware v. State,* 360 Md. 650, 712–13, 759 A.2d 764, 797 (2000), *cert. denied,* 531 U.S. 1115, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001). We have consistently found no due process violation in the provision directing that the weighing process be based on a preponderance of the evidence. That is the scheme ordained by the Legislature, and we have declared, at least 12 times, that it complies with the requirements of due process. The only question is whether *Apprendi sub silentio* overturns all of those rulings and requires a different result.

Perhaps the easiest answer lies in the unequivocal statement by the *Apprendi* majority that its decision did not render invalid State capital sentencing schemes, such as approved in *Walton,* that allowed the judge, not sitting as the trier of fact, to find and weigh specific aggravating factors. If it is permissible under *Apprendi* for the law to remove that fact-finding and fact-weighing process *entirely* from the jury and leave it to the judge as a legitimate sentencing factor,

---

aggravating circumstance justifying the 100–year sentence be established beyond a reasonable doubt, or it may have believed that the 100–year sentence could be sustained on the ground that Ford had already been found eligible for the death sentence beyond a reasonable doubt and that *Apprendi,* though applicable, was satisfied. The language it used suggests the former approach. The *Ford* case, itself, probably has no further precedential value in Illinois as the Illinois legislature amended the "extended term" provisions of the statute to require aggravating factors to be found beyond a reasonable doubt. *See* 730 Ill. Comp. Stat. 5/5–8–1(a)(1) (2001); P.A. 91–953 (2000). The conclusion that the court reached on the basis of the former statute, however, appears to put in serious doubt the approach taken in *Nitz.* Indeed, other decisions in Illinois have rejected the *Nitz* approach. *See People v. Carney,* 196 Ill.2d 518, 256 Ill.Dec. 895, 752 N.E.2d 1137 (2001), and *People v. Sutherland,* 317 Ill.App.3d 1117, 252 Ill.Dec. 851, 743 N.E.2d 1007 (2000).

without specifying a reasonable doubt standard, it can hardly
be impermissible for a jury that has found the prerequisite
aggravating factors beyond a reasonable doubt to apply a
preponderance standard in weighing them against any mitigat-
ing circumstances. The *Walton* scheme, in other words, is in
far greater direct conflict with the underpinning of *Apprendi*
than the Maryland approach. Thus, if the aggravating cir-
cumstances do not constitute elements of the offense or serve
to increase the maximum punishment for the offense in the
*Walton* context, they cannot reasonably be found to have that
status under the Maryland law. *If Apprendi renders the
Maryland law unconstitutional, then, perforce, it likely ren-
ders most of the capital punishment laws in the country
unconstitutional.*[4] We cannot conceive that the Supreme
Court, especially in light of its contrary statement, intended
such a dramatic result to flow from a case that did not even
involve a capital punishment law.[5]

---

**4.** Nine States that employ a weighing process use a reasonable doubt
standard with respect to the weighing—seven by statute, two by judicial
construction. *See* Ark.Code Ann. § 5–4–603(a), N.J.S.A. 2C:11–3(c)(3),
N.Y.Crim. Proc. Law § 400.27(11)(a), Ohio Rev.Code Ann. § 2929.03(d)(1)
and (2), Tenn.Code Ann. § 39–13–204(g)(1), Utah Code Ann. § 76–3–
207(4)(b), and Wash. Rev.Code § 10–95–060(b), *People v. Tenneson,* 788
P.2d 786 (Colo.1990), *People v. Martinez,* 22 P.3d 915 (Colo.2001), *State
v. McDougall,* 308 N.C. 1, 301 S.E.2d 308, 326, *cert. denied,* 464 U.S.
865, 104 S.Ct. 197, 78 L.Ed.2d 173 (1983), and *State v. Golphin, supra,*
352 N.C. 364, 533 S.E.2d 168. Maryland and Delaware use a prepon-
derance standard. In 26 States, no standard is set by statute.

**5.** In response, the dissent urges that Maryland's "death penalty juris-
prudence [is] unique among American death penalty jurisdictions," and
therefore our assertion of the potential unconstitutionality of most
death penalty statutes is an overstatement. Dissenting op. at p. 158.
The dissent contends that, "[i]n most states, a defendant essentially
becomes 'death eligible' upon conviction of a potentially capital crime,
and the sentencing proceeding is merely a vehicle through which the
sentencing authority selects from within a potential range of sentences,
usually between life imprisonment and death," as opposed to Maryland
where a defendant is not "death eligible" *unless* certain additional
conditions are met, namely that aggravating circumstances outweigh
mitigating circumstances. *Id.* at pp. 158 – 159. (citing *Johnson v. State,*
362 Md. 525, 529, 766 A.2d 93, 96 (2001)).

Beyond that simple comparative, it is clear to us for more basic reasons that the Maryland scheme does not run afoul of *Apprendi.* The actual holding in *Apprendi,* based on *Jones* and applying the principles of *Winship, Mullaney,* and the other cases noted above, is that "[o]ther than the fact of a prior conviction, any fact *that increases the penalty for a crime beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi, supra,* 530 U.S. at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d at 455 (emphasis added). Although not involved in *Apprendi,* it would seem clear from *Jones* and *Almendarez–Torres* that, if the fact in issue falls within that ambit, it also must be alleged with some particularity in the indictment.

As noted, Maryland law makes death the maximum penalty for first degree murder. Under § 412(b), death is the high end of the statutory range that has life imprisonment as the low end and life imprisonment without possibility of parole as the median. Neither the existence of an aggravating circumstance, nor the absence of any mitigating circumstances, nor the jury's determination that the aggravating circumstance(s) it has found to exist outweighs any mitigating circumstances, serves to increase in any way "the prescribed statutory maximum" or, indeed, the statutory range. The existence of those circumstances and the relative weight to be given to them are nothing more than standards that, pursuant to Supreme Court mandate, the Legislature has required to be applied in determining which sentence *within the statutory range* is to be imposed.

---

That is simply not the case. Although there are some variations in nearly all of the death penalty statutes, in terms of the *Apprendi* issue now before us the others around the country are substantially similar to the one in Maryland. No statute of which we are aware allows the death penalty to be imposed merely upon conviction of a death-eligible crime. Every one of them treats capital punishment as the high end of a range of permissible sentences and requires additional findings to be made, either by the jury (as in Maryland) or by the judge, in order for that sentence to be imposed. In that critical sense, there is nothing unique about the Maryland approach.

Citing *Johnson v. State*, 362 Md. 525, 766 A.2d 93 (2001), a case never mentioned by Borchardt, notwithstanding that it was filed three months before oral argument in this case, the dissent urges that life without parole and death are, indeed, "enhanced" sentences and therefore must follow at least some of *Apprendi*'s dictates. Borchardt was quite correct in ignoring *Johnson*, for it has nothing whatever to do with the matter before us. The issue in *Johnson* was whether life without parole was a permissible sentence for one convicted of *conspiracy* to commit first degree murder. Under Maryland Code, Article 27, § 38, a sentence for conspiracy may not exceed "the maximum punishment provided for the offense he or she conspired to commit." Johnson claimed that, for purposes of § 38, the maximum punishment was life imprisonment, and we agreed with him.

The issue was purely one of statutory construction—whether the Legislature could possibly have intended to make life without parole an available sentence upon a conviction of conspiracy—and we found nothing in the language or the legislative history of either § 38 or of § 412(b), authorizing the life without parole sentence upon a conviction for first degree murder, to indicate such an intent. Until amended in 1961, § 38 authorized a maximum sentence of 10 years for conspiracy, which allowed a *longer* sentence for that crime than for many of the substantive crimes that could be the subject of a conspiracy, and it was to correct *that* problem, we said, that the Legislature tied the maximum sentence for conspiracy to that provided for the substantive offense. At the time, life without parole was not an available sentence for first degree murder, or for any other crime. In subsequently providing for life without parole upon a conviction of first degree murder, the Legislature made clear that that penalty was needed as "a sentencing option"—not, incidentally, as an element of the offense, "in first degree murder cases." *Johnson*, 362 Md. at 534, 766 A.2d at 98.

Noting that the greater sentences of life without parole and death "cannot be imposed unless certain special conditions are met," *id.* at 529, 766 A.2d at 95, we characterized those

sentences as "enhanced" sentences for first degree murder and concluded, on the basis of well-established Maryland law that, "for purposes of this limitation on the sentences for conspiracy and attempt, the reference to the maximum sentence for substantive or target offenses means the basic maximum sentence and does not include any enhanced penalty provisions." *Id.* at 530, 766 A.2d at 96.

The dissent seizes on that characterization of life without parole and death as "enhanced" punishments as a basis for applying *Apprendi,* ignoring, of course, the entirely different context in which the statement was made, the clearly stated view of the *Apprendi* majority that their decision did not affect death penalty statutes, the unanimous view of all post-*Apprendi* courts to that same effect, and, indeed, the language in the *Apprendi* opinion itself. Life without parole and death obviously are enhanced punishments, just as, in sentencing for any crime, the highest penalty allowed is an enhancement over a lesser penalty allowed—20 years is an enhancement over 10 years, one year is an enhancement over a fine or probation. The point missed by the dissent is that both life without parole and death are part of the sentencing range authorized by the Legislature for the crime of first degree murder. Unlike the situation in *Apprendi,* the death sentence is not in excess of the maximum statutory penalty for the offense. We made clear in *Gary v. State,* 341 Md. 513, 517–18, 671 A.2d 495, 497 (1996), cited in *Johnson,* that "a sentence of life imprisonment for conspiracy to commit first degree murder is the *lowest* of the statutory penalties for first degree murder." (Emphasis added). The dissent turns *Gary* on its head by effectively treating life imprisonment not just as the *lowest* of the statutory penalties for first degree murder, but also as the *highest.* Under *Johnson* and *Gary,* life without parole and death are within the range of penalties allowed by the Legislature upon a conviction for first degree murder.

That is precisely the point made by the *Apprendi* majority in quoting from Justice Scalia's dissent in *Almendarez–Torres*—that once the jury has found the defendant guilty

of all of the elements of an offense that carries as its maximum penalty the sentence of death, the determination of whether to impose that penalty, as opposed to a lesser one also within the statutory range, is properly a sentencing factor not subject to the *Apprendi* strictures. It follows as well from the concepts and holdings in *Winship* (requiring "every fact necessary to constitute the crime with which [the defendant] is charged" to be proved by the State beyond a reasonable doubt, to reduce the risk of "convictions resting on factual errors"), *Mullaney* (expressing concern over States redefining elements that constitute different crimes as factors bearing only on punishment), *Patterson* (allowing State to permit severity of punishment authorized for an offense to depend on identified facts without assuming burden of proving presence or absence of those facts beyond reasonable doubt), and, of course, *Jones*.

Although the dissenters in *Apprendi* perhaps had some reason for concern as to whether a *Walton*-type scheme might be jeopardized, in the sense that the determination of whether aggravating or mitigating circumstances exist is in the nature of a fact-finding process, in which the ultimate determination must be based on evidence, it is a stretch to apply that concern, as Borchardt and the dissent would do, to the weighing process provided for in § 413(h). Notwithstanding the language in § 414(e)(3) directing this Court, on appellate review, to determine whether "the evidence supports the jury's ... finding that the aggravating circumstances outweigh the mitigating circumstances," the weighing process is not a fact-finding one based on evidence. Mitigating circumstances do not negate aggravating circumstances, as alibi negates criminal agency or hot blood negates malice. The statutory circumstances specified or allowed under § 413(d) and (g) are entirely independent from one another—the existence of one in no way confirms or detracts from another. The weighing process is purely a judgmental one, of balancing the mitigator(s) against the aggravator(s) to determine whether death is the appropriate punishment in the particular case. This is a process that not only traditionally, but quintessential-

ly, is a pure and Constitutionally legitimate sentencing factor, one that does not require a determination to be made beyond a reasonable doubt. *See Gerlaugh v. Lewis,* 898 F.Supp. 1388, 1421–22 (D.Ariz.1995), *aff'd,* 129 F.3d 1027 (9th Cir.1997), *cert. denied,* 525 U.S. 903, 119 S.Ct. 237, 142 L.Ed.2d 195 (1998) (Constitution does not require weighing beyond a reasonable doubt); *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *Miller v. State,* 623 N.E.2d 403, 409 (Ind.1993) (weighing is a balancing process, not a fact to be proven; reasonable doubt standard does not apply).

■ The incongruity of applying *Apprendi* to this process is particularly apparent with respect to the requirement that, if the determination that aggravating circumstances outweigh mitigating circumstances is treated as an element that must be proved by the State beyond a reasonable doubt, it also must be sufficiently alleged in the indictment. Borchardt has made that argument under both Federal due process and Article 21 of the Maryland Declaration of Rights. No case, to our knowledge, has required that aggravating circumstances, mitigating circumstances, or a weighing of them be set forth in the indictment, yet, if *Apprendi* and *Jones* are applicable, that clearly would be so under Federal due process and likely would be so as well under Article 21.[6]

---

**6.** The dissent agrees that the Fourteenth Amendment does not incorporate the Sixth Amendment's mandate of a Grand Jury indictment. Dissenting op. at p. 174 ("The majority and I agree on at least one point, namely, that the State need not charge, in the indictment, that the aggravating circumstances it alleges outweighs any mitigating circumstances.") The dissent's only issue here is that a different result should be reached on the burden of proof issue respecting the weighing process of aggravating and mitigating circumstances on the grounds of the Fourteenth Amendment's Due Process Clause and Article 24 of the Declaration of Rights.

There is a fatal flaw in that conclusion, however. If, as the dissent argues, *Apprendi* applies and requires a different burden of proof under Article 24, then the weighing process is no longer a sentencing factor and is transformed into an essential element of the crime of first degree murder, at least where the death penalty is sought. If that is so, Article 21 of the Maryland Declaration of Rights must be applicable as well.

Maryland law, as noted, requires that the State give advance written notice of the aggravating factors upon which it intends to rely, and that, of course, is possible for the State to do. It is quite impossible, however, other than in a blanket and meaningless denial, for the State to negate the existence in an indictment of all possible mitigating circumstances, which the defendant has the burden at trial of identifying and establishing, especially in light of the fact that, under § 413(g)(8), a mitigating circumstance can be anything any juror finds appropriate. How can the State effectively charge, in the indictment, that the aggravating circumstances it alleges outweighs any mitigating circumstances if it is impossible at that point to know what mitigating circumstances the jury might find to exist?

■ As individual judges, we might well entertain the personal belief that it would be more fair, or better public policy, for the jury to apply a reasonable doubt standard in determin-

---

Article 21, in pertinent part, states, "That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; . . . ." We have long held that for constitutional purposes, a criminal information or indictment must contain the essential elements of a crime charged. *See State v. Mulkey*, 316 Md. 475, 481, 560 A.2d 24, 27 (1989); *State v. Canova*, 278 Md. 483, 498, 365 A.2d 988, 997 (1976) (" '[A] criminal charge must so characterize the crime and describe the particular offense so as to give the accused notice of what he is called upon to defend and to prevent a future prosecution for the same offense.' " (quoting *Corbin v. State*, 237 Md. 486, 490, 206 A.2d 809, 811 (1965))). Further, the constitutional purposes for Article 21's requirements are:

"(1) *putting the accused on notice of what he is called upon to defend* . . .; (2) protecting the accused from a future prosecution for the same offense; (3) enabling the accused to prepare for his trial; (4) providing a basis for the court to consider the legal sufficiency of the charging document; and (5) *informing the court of the specific crime charged so that, if required, sentence may be pronounced in accordance with the right of the case.*"

*Mulkey, supra*, 316 Md. at 481, 560 A.2d at 27 (emphasis added). Following the dissent's application of *Apprendi* under independent State grounds, to be constitutionally sound, Article 21 must apply and would require the indictment or information to specifically set forth the weighing process to facilitate the accused in preparing a defense and the court in pronouncing the sentence "in accordance with the right of the case." This is a task that can never practically be attained.

ing that aggravating circumstances outweigh mitigators—to be *that* convinced before sentencing a person to death. That is a judgment for the Legislature to make, however, and, unlike its counterparts in other States, which have legislatively imposed a reasonable doubt standard, the Maryland General Assembly has chosen a different approach—one that we have consistently upheld as Constitutional. To apply *Apprendi* as Borchardt urges would be nothing less than a substitution of our judgment of what the law *ought to be* for what the Legislature has said it *is*. That is not our function.

### *Prior Consistent Statement of Tammy Ent*

Borchardt's son testified as a State's witness. He stated that, on the day of the murders, he and Tammy Ent, his then-girlfriend, were living in a two-bedroom apartment with his father and Jeanne Cascio. That evening, Borchardt said that he had got some "bad stuff," meaning heroin, and that he and Cascio had to go out "and hustle money for some more." When they returned about 20 minutes later, the son saw Cascio bandaging his father's finger and Borchardt said to him that he and Cascio would have to leave for a while because he "had to stab a couple of people." Borchardt also instructed his son that "[i]f anybody comes looking for me, tell uhm you haven't seen me for a week."

When asked what Borchardt and Cascio were wearing when they first left the apartment to hustle money, the son said that he could not remember. On cross-examination, the son acknowledged that, in a statement he had given to the police, he said that his father had worn a black leather jacket. Borchardt was wearing a black leather jacket when he was arrested the next day.

The next witness was Tammy Ent. She confirmed the living arrangements, that Borchardt and Cascio left the apartment and returned together, and that, upon their return, she heard Borchardt tell his son that "if anybody came looking for him, they hadn't been there in a week." On direct examination, she said that, when they left again, Cascio was wearing black

leggings, a red sweater, and a black wool sport coat with white speckles, and that Borchardt had on jeans, a short-sleeve button-up shirt, and a leather coat. She said that he "could have" been wearing a red, white, and blue windbreaker that she identified. She also identified a sweater and leggings that she said Cascio was wearing.

On cross-examination, Ent said that she did not recall the color of Cascio's jeans or of Borchardt's shirt, although she thought it was blue. Counsel called her attention to a statement she had given to the police the day after the murders, in which she said that Borchardt was wearing a red and white shirt. She admitted that she had not actually seen Borchardt wearing the red, white, and blue windbreaker and that she had told the police he was wearing a black leather jacket. On redirect examination, Ms. Ent identified the statement she gave to the police and acknowledged that her memory was better when she gave that statement than it was on the day of trial. At that point, over a general objection, the full statement was admitted into evidence and read to the jury. Included in that document, in addition to her description of the clothing worn by Cascio and Borchardt, was the statement that, after Borchardt and Cascio left the second time, the son told her that Borchardt and Cascio were leaving for a few days and that, when she asked why, "he told me that his father had stabbed one or more people, possibly killed them," and, when she again asked why, "he said probably to get a drug."

Borchardt regards that part of the written statement as inadmissible and "grossly prejudicial" hearsay that warrants a reversal of the judgments against him. The statement was multiple hearsay—the witness's recounting of what her boyfriend told her his father had told him—and was collateral to the matter brought up on cross-examination, which dealt only with the clothes Borchardt and Cascio were wearing. Although acknowledging the dreadfully inculpatory statement Borchardt himself gave to the police, he urges that the voluntariness of that statement was contested and that Ms. Ent's statement could not, therefore, be regarded as harmless

error. The State contends that the issue was not preserved, that the statement was admissible as a prior consistent statement, and that any error was, indeed, harmless.

We believe that the issue *was* preserved by the general objection, that the challenged part of the statement, on its face, was double-level hearsay and, as such, was inadmissible, and that it was not rendered admissible as a prior consistent statement offered to rehabilitate the witness following impeachment. Without belaboring the matter, it is not at all clear that Ms. Ent was impeached, and thus in need of rehabilitation, by anything she said on cross-examination. We are unable to find anything she said on cross-examination that was substantially inconsistent with her direct testimony or that otherwise put her credibility into doubt. Even if there was some impeachment regarding the clothes she saw Borchardt and Cascio wearing, her statement regarding what the son told her had utterly no relevance to that issue and had no rehabilitative value whatever.

The admission of that one passage in the police statement was error, but, on this record, it was, beyond any reasonable doubt, harmless. *See Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). Apart from Borchardt's own statement that was in evidence, in which he admitted not only the stabbings but having told his son that he "had done something stupid and stabbed somebody," Ms. Ent's recitation of what Borchardt's son told her came immediately after the same testimony, *without objection,* was given from the son, whom Borchardt made no attempt to impeach. Coupled with the overwhelming physical evidence tying Borchardt to the killings, this one corroborative hearsay statement from Ms. Ent could not possibly have influenced the verdicts.

### Other Crimes Evidence

Borchardt complains about the admission, during both his trial as to guilt or innocence and at the sentencing proceeding, of part of the statement he gave to the police following his arrest and about two other statements attributed to him—one

relayed by officials at the Baltimore County Detention Center and the other by his son and former wife—that were included in the pre-sentence investigation report presented at his sentencing. All three statements, he avers, constituted inadmissible "other crimes" evidence, the prejudice of which outweighed any probative value they might have. The State responds that these complaints were not properly preserved and that, in any event, they have no merit.

The first statement came into evidence through the testimony of Detective West who, after giving Borchardt his *Miranda* warnings, took a statement from him, in which Borchardt described in some detail how he had killed the Ohlers. The statement was dictated by Borchardt and written down by Detective Landsman, following which Borchardt reviewed the document and signed and dated each page. After reading the statement into evidence, Detective West was asked whether Borchardt said anything else that evening, to which, over objection, West responded:

> "Mr. Borchardt told us that he has a taste of blood now and he wants to keep killing, whether it be inside or outside of jail. For the past several weeks he's been wanting to hurt somebody. He had his friend, Paul ... sharpen his knife."

Borchardt had moved, unsuccessfully, to suppress his entire statement to the police, including this passage, on the ground that it was involuntary, and, when this additional response was presented at trial, he made a general objection to it. The State's non-preservation argument is based on Borchardt's omission to make a specific objection that the challenged passage constitutes impermissible other crimes evidence. We believe that the issue was preserved.[7]

---

7. Unlike the practice in Federal court and the courts of other States, the rule in Maryland is that, "[i]f neither the court nor a rule requires otherwise, a general objection is sufficient to preserve all grounds of objection which may exist." *Grier v. State,* 351 Md. 241, 250, 718 A.2d 211, 216 (1998); *Ali v. State,* 314 Md. 295, 305–06, 550 A.2d 925, 930 (1988); Md. Rule 5–103(a)(1). Trial judges in this State have lived under that rule for quite some time, and ordinarily it causes no problem, especially since the judge can always demand specificity when

There was, however, no error. For one thing, the passage in question did not constitute "other crimes" evidence. The rule invoked by Borchardt is that "[g]enerally, 'evidence of a defendant's prior criminal acts may not be introduced to prove that he is guilty of the offense for which he is on trial.'" *State v. Faulkner*, 314 Md. 630, 633, 552 A.2d 896, 897 (1989) (quoting *Straughn v. State*, 297 Md. 329, 333, 465 A.2d 1166, 1168 (1983)). The challenged passage did not implicate Borchardt in the commission of any crime other than the one for which he was then on trial.

Borchardt cites *Snyder v. State*, 361 Md. 580, 762 A.2d 125 (2000) in support of his complaint, and, to that extent, it would appear that he is seeking to invoke the declaration of Md. Rule 5–404(b) that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," coupled with the provisions of Md. Rules 5–403 that allow a trial judge to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. He contends that the statement was not relevant to guilt but went only to propensity and that, even if there was "marginal relevance" to the evidence, its prejudicial effect outweighed any probative value. That also avails him naught. To the extent that the challenged passage even falls within the ambit of Rule 5–404(b), it was part of his confession to the crime. The last sentence of the statement, about having wanted to hurt someone and having had his knife sharpened,

---

faced with an uncertain situation. When a party seeks to exclude other crimes or prior bad act evidence under Maryland Rule 5–404(b) or to exclude otherwise relevant evidence under Rule 5–403 on the ground that the probative value of that evidence is substantially outweighed by the danger of unfair prejudice, however, a special problem emerges, for in those situations the court must make one or more preliminary findings in order to determine admissibility. In the case of other crimes evidence, it must engage in the three-part analysis required by *State v. Faulkner*, 314 Md. 630, 552 A.2d 896 (1989). A general objection may not alert the court to the need to conduct that analysis or to make any other preliminary findings that may be required. That, however, is a problem with the rule.

was clearly relevant to the issues of premeditation and deliberation. The first sentence was also directly relevant to his criminal agency—the blood that he tasted was that of the Ohlers. The statement *was*, therefore, relevant to his guilt and was properly admitted.

■ Over a general objection, all evidence presented at the guilt-innocence trial was admitted, in bulk, at the sentencing proceeding, including that part of his statement to the police. The only complaint Borchardt makes in that regard is that the admission of the statement at the guilt-innocence stage "also infected the sentencing hearing." He does not tell us, and we are unable to discern, how it "infected" the sentencing proceeding. Certainly, the statement that Borchardt had tasted blood and would kill again is highly relevant to (1) whether Borchardt was a principal in the first degree, and (2) the mitigating circumstance under § 413(g)(7) of whether he was likely to engage in further criminal activity that would constitute a continuing threat to society.

■ Also admitted at the sentencing proceeding was a pre-sentence investigation report prepared by the Department of Public Safety and Correctional Services Division of Parole and Probation. Such a report, by statute, is admissible. *See* § 413(c)(1)(iv). Included in the report, under the part dealing with Institutional History, was the following note pertaining to Borchardt's stay at the Baltimore County Detention Center:

"1/11/99 Incident Report reveals that, while being moved to suicide watch on 2–C, the defendant threatened nurse Linda Keyser, telling her he would cut out her eyes and her heart if he got the chance. He also reported he would look her up in the phone book and kill her. This incident reportedly occurred after he refused to take his insulin. As a result of the incident, he was placed in a restraint chair, due to lack of space. Found guilty of the charges, he was issued a verbal warning."

Under the part dealing with Personal History was a report from Borchardt's former wife that "he was making threatening comments should he not get his girlfriend's furniture," and

a report from his son about similar threats regarding the furniture, including a threat to send some one over "to fuck us up because we did him wrong."

 Borchardt complains that these notes also constitute inadmissible "other crimes" evidence that were grossly prejudicial to him. Even assuming that they do constitute "other crimes" evidence, which is not at all clear, they were directly relevant to the issues then before the jury. When so relevant, other crimes evidence, bad act evidence, and evidence of a defendant's institutional adjustment are generally admissible in a capital sentencing proceeding. *See Hunt v. State,* 321 Md. 387, 431–33, 583 A.2d 218, 239–40 (1990); *Conyers v. State,* 354 Md. 132, 182–83, 729 A.2d 910, 937, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999).

### Adequacy of Voir Dire Examination

The voir dire examination of prospective jurors was conducted in two phases. After certain introductory comments, the court first asked the entire panel a series of questions designed to elicit ability to serve and bias. No complaint is made about that part of the process. Following that group examination, the court asked each remaining prospective juror, individually, five questions regarding his or her views about capital punishment:

(1) whether the juror had strong feelings either that the death penalty should be imposed in every case of first degree murder, regardless of the facts and circumstances, or that it should never be imposed regardless of the facts and circumstances;

(2) whether any feelings that the juror had about the death penalty would prevent or substantially impair him or her from making an impartial decision about Borchardt's guilt or innocence;

(3) whether any such feelings would prevent or substantially impair the juror in sentencing Borchardt in accordance with the evidence and the law;

(4) whether, after listening to the evidence and applying the law, if convinced that the appropriate sentence should be death, the juror would be able to vote for the death penalty; and

(5) whether, after listening to the evidence and applying the law, if not convinced that the appropriate sentence should be death but convinced that the appropriate sentence should be life imprisonment, the juror would vote for life imprisonment.

If any juror, in response to those questions, expressed a position about the death penalty, one way or the other, individual follow-up questions were allowed.

Defense counsel had prepared a far more extensive list of voir dire questions, including 43, some of which were multi-part, dealing with the death penalty. Some of those questions were included in the ones asked by the court; many were not. Borchardt complains about some of the ones that were not asked, in particular those that informed the jurors, in some detail, of the various aggravating and mitigating factors, and asked whether, as to each statutory mitigating circumstance and as to eight possible non-statutory mitigating circumstances, the juror would be able to follow the court's instruction and consider and weigh such a factor. We shall not lengthen this opinion with a recitation of everything that was requested but note, by way of example, questions such as whether evidence of Borchardt's troubled childhood, mental development, or addiction to drugs or alcohol, or the harshness of prison conditions or the circumstances of the victims' death would make a difference in sentencing and, if so, how. At that point, of course, the prospective jurors had utterly no factual information regarding any of those considerations— what kind of childhood Borchardt had, what his mental development was, or what the circumstances were of the victims' death.

Borchardt contends that the court's refusal to propound those questions—to "address the role of mitigating and aggravating factors" and "explain to the jury in any detail ... how the Maryland sentencing scheme operated"—constituted a

violation of the mandate of the Supreme Court in *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). He urges, as well, that the voir dire was insufficient under this Court's holding in *Dingle v. State,* 361 Md. 1, 759 A.2d 819 (2000). We disagree with both assertions.

As we explained in *Evans v. State,* 333 Md. 660, 672, 637 A.2d 117, 123, *cert. denied,* 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994), the *Morgan* Court had before it whether a "reverse *Witherspoon* " question was required on voir dire in a death penalty case. At the State's request, and in conformance with *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the trial court had asked prospective jurors whether any of them had moral or religious principles so strong that they could not impose the death penalty regardless of the facts. The court refused to ask the converse, however—whether, if they found Morgan guilty, they would automatically vote to impose the death penalty, regardless of the facts. The court asked, instead, whether the jurors could be impartial, give both sides a fair trial, and follow the court's instructions on the law even if they disagreed with those instructions, and the State urged that those instructions were sufficient.

The Supreme Court disagreed. The point at issue, it said, was the defendant's ability to exercise intelligently his right to challenge for cause "those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt," and its response was that, if voir dire were not available to support the foundation for a "challenge for cause against those prospective jurors who would *always* impose death following conviction," the defendant's right not to be tried by such jurors would be rendered nugatory. *Morgan, supra,* 504 U.S. at 733–34, 112 S.Ct. at 2232, 119 L.Ed.2d at 505–06. General questions as to fairness, impartiality, or ability to follow instructions, the Court held, did not suffice, for, in its view, any juror who would impose the death penalty regardless of the facts and circumstances "cannot follow the dictates of law." *Id.* at 735, 112 S.Ct. at 2233, 119 L.Ed.2d at 506. It may well be, the Court continued, "that a juror could, in good

conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *Id.* at 735, 112 S.Ct. at 2233, 119 L.Ed.2d at 507.

The issue presented here by Borchardt was raised and rejected by us in *Evans v. State, supra,* 333 Md. 660, 637 A.2d 117. The trial court there asked essentially the same questions posed here, and Evans complained that, under *Morgan,* they sought merely "bottom line conclusions" and were insufficient to elicit bias in favor of the death penalty. We held that the questions posed were "sufficient for Evans and his counsel to determine whether prospective jurors were death-penalty dogmatists, and they were clearly sufficient to meet the standard enunciated in *Morgan v. Illinois.*" *Evans,* 333 Md. at 675, 637 A.2d at 124. *See also Oken v. State,* 343 Md. 256, 268–77, 681 A.2d 30, 36–40 (1996), *cert. denied,* 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 681 (1997).

Jurors do not need to be instructed about the details of the sentencing procedure or questioned as to how they might feel about particular aggravating or mitigating factors that may or may not be established in the case in order to determine whether they have a pre-conceived, fixed, and unshakable bias for or against the death penalty. As we pointed out in *Burch v. State,* 346 Md. 253, 295, 696 A.2d 443, 464, *cert. denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997), "[a] defendant has no right to question prospective jurors, under the guise of searching for disqualifying bias, to see who might be receptive to any of the myriad of potential mitigating factors he or she may choose to present." None of the cases cited by Borchardt in his brief hold to the contrary.

Nor does *Dingle* provide any relief. The problem addressed in that case was the asking of compound questions that did not suffice to elicit potentially disqualifying information—whether, for example, the juror or family member or close friend belonged to a victim's rights group *and,* if the answer was "yes," whether that would interfere with the juror's ability to be fair and impartial. The evil that the Court

found with that approach is that a juror would not respond affirmatively just to the first part of the question, thereby eliminating the prospect of further questions regarding the attachment or affinity and how it might affect the juror. It left to the jurors themselves, and thus removed from the court, the assessment of whether they could be fair and impartial. *See Dingle, supra,* 361 Md. 1, 21, 759 A.2d 819, 830. None of the questions objected to by Borchardt were of that character.

### *Inconsistency in Sentencing Verdicts*

 In accordance with our direction in *Burch v. State, supra,* 346 Md. 253, 290, 696 A.2d at 461–62, the court presented to the jury at the sentencing hearing two sentencing forms, as prescribed by Maryland Rule 4–343(g)—one for each victim. On each form, the jurors unanimously found, in Section I, that Borchardt was a principal in the first degree to the murder, in Section II, that two aggravating circumstances existed—that Borchardt committed more than one offense of first degree murder arising out of the same incident and that he committed the murder while committing or attempting to commit robbery—and, in Section III, that none of the seven statutory mitigating factors existed. One or more jurors, but fewer than all, found in Section III that three other mitigating factors existed:

"Dysfunctional family (emotional, physical + sexual abuse)

Life w/out parole is severe enough

Health Problems"

The jurors also unanimously found, in Section IV, "that the aggravating circumstances marked 'proven' in Section II outweigh the mitigating circumstances in Section III," and, in Section V, they all determined the sentence to be death.

Borchardt urges that "[t]he finding by at least one juror that 'Life w/out parole is severe enough' leads to the conclusion that the death sentence here was arbitrarily imposed and must be vacated." He contends that that statement creates an ambiguity or inconsistency in the verdict and cites a

number of cases for the proposition that, when a death penalty verdict is internally ambiguous or inconsistent, it must be stricken. The problem, for Borchardt, is that there is no fatal inconsistency or ambiguity. He overlooks the fact that the listing of something that one or more jurors believes to be a mitigating factor is merely a subordinate step in the process. It is the weighing of those factors against the aggravating factors that guides the jury in determining the sentence. One or more jurors obviously believed that life without parole is ordinarily a severe enough sentence for first degree murder, but those same jurors, just as obviously, did not believe that to hold true when balanced against the two aggravating circumstances they found to exist in this case. We perceive no ambiguity, no inconsistency, and no arbitrariness.

### Court's Alleged Failure to Impose Sentences on Murder Convictions

When the jury returned with its verdicts, the forelady passed the two completed sentencing forms to the court and then announced, in open court, each finding the jury had made. Consistently with the written forms, she stated, with respect to each victim, that the jury determined the sentence to be death. Each juror was then polled and confirmed those verdicts, following which the jury was discharged. The State then presented to the court a warrant of execution and a stay of execution which, in accordance with Maryland Code, § 3–902(c) and (d) of the Correctional Services Article, the judge signed. The judge then informed Borchardt, pursuant to Maryland Rule 4–343(i), that the determination of guilt and the sentence would be automatically reviewed by this Court and that the sentence would be stayed pending that review, following which she imposed sentence on the robbery convictions.

Because the record does not reflect that the judge ever uttered the words, "I hereby sentence you to death," Borchardt contends that no such sentence was ever imposed. He treats that omission as equivalent to a suspension of sentence on the murder counts and urges that it is now too late to

correct that omission or modify the suspension. He asks us to remand the case to the Circuit Court with instructions to strike the sentences of death and enter an amended judgment suspending sentence on the murder counts. We shall decline that invitation, for there is no basis for it.

When a defendant facing the death penalty chooses a jury as the sentencing tribunal, it is the jury that determines the sentence. Article 27, § 413(k) provides that, if the jury determines that a sentence of death shall be imposed, "the court shall impose a sentence of death." The court has no authority to impose any other sentence, and it has no authority, by act or omission, to suspend the death sentence. We made the point succinctly in *Burch v. State, supra,* 358 Md. 278, 284–85, 747 A.2d 1209, 1212: "When a jury returns a verdict of death, the trial judge must impose one sentence— death." Even if the judge omits the magic words, the sentence of death will be recorded as a matter of law, for that is the only allowable sentence.

Here, it is clear that the court *did* impose the death sentence. Section 3–902(c) of the Correctional Services Article requires that "[a]t the time an individual is sentenced to death, the judge presiding in the court shall issue a warrant of execution directed to the Commissioner [of Correction]." The warrant of execution signed by the judge states, in relevant part, that Borchardt was convicted by a jury of murder in the first degree of Joseph and Bernice Ohler, and "in the Circuit Court for Anne Arundel County, the said Lawrence Borchardt, Sr. *was sentenced to death,* under Article 27, Sections 412–413, of the Annotated Code of Maryland." (Emphasis added). The stay of execution signed by the judge contains similar language. The docket entries show that the sentence under Charge 01 and Charge 02 was "DEATH Sentence." In imposing the 20–year sentence for the armed robbery of Mr. Ohler, the court stated that the sentence was "consecutive to the death sentence determined by the jury." The Report of the Trial Judge, filed with this Court pursuant to § 414(b) states that the sentence imposed was "Death (2 counts)." On

this record, it is preposterous to suggest that Borchardt was not sentenced to death.

### Merger of the Robbery Convictions

At the conclusion of the trial on guilt/innocence, the jury returned a verdict on four counts. It found Borchardt guilty of robbery with a deadly weapon of Joseph and Bernice Ohler (Counts 1 and 4), and felony and premeditated murder of Joseph and Bernice Ohler (Counts 2 and 5). Both forms of murder were specified in the verdicts, and both rendered Borchardt eligible for the death penalty. It was not necessary for the jury, in carrying out its sentencing function, to distinguish between them or to deal with one, rather than the other, and, when the issue of sentence was presented to the jury, no distinction was made. The sentencing form, following the form prescribed by Maryland Rule 4–343(g), simply referred to "the murder." Borchardt contends that the death sentence imposed on the murders was therefore a "general sentence" that did not specify the form of first degree murder to which it related, that it must be treated as if imposed on the felony murder convictions, and that, under *Newton v. State*, 280 Md. 260, 373 A.2d 262 (1977) and *State v. Frye*, 283 Md. 709, 393 A.2d 1372 (1978), the underlying felonies must merge into the greater, inclusive offenses.

That is not the case. In *Newton*, we concluded that felony murder and the underlying felony must be treated as one offense for double jeopardy purposes and that, for sentencing, the underlying felony must merge into the murder. That is because felony murder contains every element contained in the underlying felony and therefore does not present the situation in which each offense contains an element not found in the other. We also made clear, however, that if a first degree murder conviction is based on independent proof of premeditation and deliberation, the murder, even if committed in the course of a felony, would not be deemed the same offense as the felony and there would therefore be no merger. In *Frye*, we held that, whether a merger is required depends on the basis for the jury's verdict on the murder count: "The

convictions and sentences for the underlying felonies ... are supportable if the juries found wilful, deliberate and premeditated killings but are not supportable if the murder verdicts rested upon the felony murder theory." *Frye,* 283 Md. at 722, 393 A.2d at 1379. In the two cases consolidated before us in *Frye,* the defendants were charged under both theories, but the juries were not instructed to specify in their verdicts which form, if either, they found, and they returned a general verdict of guilty. When the verdict is ambiguous in that manner, the doubt is resolved in the defendant's favor and the sentences imposed on the underlying felonies are vacated.

The critical determination is the verdict. Merger in this kind of setting is mandated only when, for double jeopardy purposes, the two offenses are the same—when all elements required for the lesser offense are also required for the greater and only one has an element not found in the other. When the trier of fact returns a guilty verdict of premeditated murder, that is not the case, for both the underlying felony and the murder in that situation contain an element not required in the other. As noted, that was the case here. There was no ambiguity in the verdicts. The armed robbery convictions did not, therefore, merge into the premeditated murder convictions, regardless of the form of murder for which the death sentence was imposed, and the imposition of separate sentences for the robberies was permissible.

### Robbery of Ms. Ohler—Sufficiency of Evidence

Borchardt makes two arguments with respect to Count 4 of the indictment, charging him with the armed robbery of Bernice Ohler. First, he contends that the evidence was legally insufficient to support that conviction and that his motion for judgment of acquittal on that count should therefore have been granted. Second, given that he was also convicted under Count 1 of the armed robbery of Joseph Ohler, he argues that his conviction and sentence for robbing Bernice violated his right against double jeopardy. We disagree.

Count 4 of the indictment charged that Borchardt, using a deadly weapon, "feloniously ... did rob Bernice Ohler and violently did steal from her a wallet, current money of the United States and personal papers...." Count 1 was identical, except that it named Joseph Ohler as the victim. The evidence relating to the robbery showed that Borchardt removed a wallet, which contained $11 in cash and various cards, from a chest or desk in the hallway, that he took the wallet and its contents from the house, and that the wallet, cash, and cards belonged to Joseph Ohler. That, indeed, is the basis of the first prong of Borchardt's challenge to the conviction-that the property taken did not belong to Bernice and that it was not taken from her person.[8]

The State acknowledges that the wallet, money, and cards belonged to Joseph, and not Bernice, but that is not dispositive of the issue. We made clear in *State v. Colvin*, 314 Md. 1, 548 A.2d 506 (1988) that a robbery conviction may be sustained even if the victim of the force is not the owner of the property taken and is not in the immediate presence of the property when it is taken. We pointed out that "[r]obbery convictions have been sustained where the victim was in one room of a house or place of business and property was taken from another room" and that the defendant may be convicted "even though [the person killed] was not the owner of the jewelry." *Id.* at 20, 548 A.2d at 515. In *Ball v. State*, 347 Md. 156, 188, 699 A.2d 1170, 1185 (1997), *cert. denied*, 522 U.S.

---

**8.** The State could possibly have charged Borchardt with robbing Ms. Ohler of her jewelry, but it omitted to do so. From the fact that the police found women's jewelry scattered on the living room floor a fair inference could have been drawn that the jewelry belonged to Bernice Ohler and that Borchardt removed the jewelry from her purse or from some other place where it was stored and transported it some distance either before or after stabbing her. Under our holding in *Ball v. State*, 347 Md. 156, 699 A.2d 1170 (1997), that would suffice to support a charge of robbery with respect to Bernice. The State did not rest its robbery charge with respect to Bernice on the theft of the jewelry, however, but limited the charge to the theft of the wallet and its contents. That was the sole allegation in the indictment and that was what the prosecutor argued to the jury. We must, therefore, look at the sufficiency of the evidence in that light.

1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998), we added that if "the use of force enables the accused to retain possession of the property in the face of immediate resistance from the victim, then the taking is properly considered a robbery."

As we said, the wallet was taken from a desk or chest in the Ohler home, not directly from Mr. Ohler's person. Although Mr. Ohler may have been the owner of the wallet, there is a fair inference that Ms. Ohler had equivalent possession of the desk or chest and thus of the wallet in the chest. Moreover, she offered active resistance to Borchardt's taking the item by confronting him and informing him that she had called the police. Had Ms. Ohler been alone in the house and stabbed while attempting to prevent Borchardt from removing the wallet, there clearly would have been a robbery; it makes her no less the victim of a robbery that her husband was also present and offered resistance.

 The second prong of Borchardt's argument is that the court erred in allowing a double conviction for the "single criminal transaction" in which he took Mr. Ohler's wallet. As we pointed out in *Richmond v. State,* 326 Md. 257, 261, 604 A.2d 483, 485 (1992), whether, for double jeopardy purposes, "a particular course of conduct constitutes one or more violations of a single statutory offense" depends upon "the appropriate unit of prosecution of the offense and this is ordinarily determined by reference to legislative intent." In the case of theft, which is a crime against property, we have adopted the "single larceny doctrine," which treats as one offense the stealing of separate items of property at one time, whether they belong to the same owner or to different owners. *State v. White,* 348 Md. 179, 702 A.2d 1263 (1997). At the time the crimes here were committed, robbery was a common law offense in Maryland, so a resort to legislative intent is not possible.[9] We have defined the crime as "the felonious taking

---

9. Until 2000, robbery was a common law crime. The statute, Article 27, § 486, merely provided the sanctions to be imposed upon conviction. By 2000 Md. Laws, ch. 288, the Legislature created a statutory offense. It defined subordinate terms and stated, in new § 486(b) that

and carrying away of the personal property of another from his person by the use of violence or by putting in fear." *Metheny v. State*, 359 Md. 576, 605, 755 A.2d 1088, 1104 (2000) (quoting *Williams v. State*, 302 Md. 787, 792, 490 A.2d 1277, 1280 (1985)). The crime thus embodies elements of both larceny and assault.

Decisions are split around the country on whether a defendant may be convicted of more than one robbery when, in a single incident, he or she takes money or other property from the possession or presence of more than one person. Those holding that the individual victim is the unit of prosecution and that multiple convictions are valid stress the assaultive, rather than the larcenous, nature of the crime; those holding otherwise tend to emphasize the theft element. *See Commonwealth v. Levia*, 385 Mass. 345, 431 N.E.2d 928, 931 (1982) (offense of robbery is against the person assaulted, not the owner of the property; so long as the victim has some protective concern with respect to the property taken and the property is taken from his or her person or presence, defendant may be convicted and sentenced for multiple offenses); *Commonwealth v. Donovan*, 395 Mass. 20, 478 N.E.2d 727, 735 (1985) (unit of prosecution for armed robbery is the person assaulted and robbed); *People v. Wakeford*, 418 Mich. 95, 341 N.W.2d 68, 75 (1983) (same); *State v. Jones*, 344 S.C. 48, 543 S.E.2d 541, 544 (2001) (where there is a threat of bodily injury to each person from whom property is stolen, the defendant may be charged with separate offenses); *Ex Parte Hawkins*, 6 S.W.3d 554, 560 (Tex.Cr.App.1999) (as robbery is a form of assault, unit of prosecution is same as that for assault—the victim); [10] *Jordan v. Commonwealth*, 2 Va.App. 590, 347

---

"(1) Robbery retains its judicially determined meaning, except that a robbery conviction requires proof of intent to deprive another of property; or (2) Robbery includes obtaining the service of another by force or threat of force."

**10.** The *Hawkins* court expressly overruled an earlier decision, *Ex Parte Crosby*, 703 S.W.2d 683 (Tex.Cr.App.1986) that was almost identical to the case now before us and had held that, when the defendant broke into a residence, assaulted husband and wife, and took a wallet from

S.E.2d 152, 156 (1986) (because essential character of robbery is violence against a person for purpose of theft, appropriate unit of prosecution is determined by number of persons from whose possession property is taken separately by force or intimidation); *Clay v. Commonwealth,* 30 Va.App. 254, 516 S.E.2d 684, 686 (1999).

Compare *State v. Collins,* 174 W.Va. 767, 329 S.E.2d 839 (1984) (treating robbery as "an aggravated form of larceny" and applying single larceny doctrine to attempted armed robbery); *Allen v. State,* 428 N.E.2d 1237, 1240 (Ind.1981); *People v. Nicks,* 23 Ill.App.3d 435, 319 N.E.2d 531, 535–36 (1974), *rev'd in part,* 62 Ill.2d 350, 342 N.E.2d 360 (1976); *State v. Potter,* 285 N.C. 238, 204 S.E.2d 649, 658–59 (1974).

In *Novak v. State,* 139 Md. 538, 115 A. 853 (1921), we necessarily adopted the person assaulted as the unit of prosecution for robbery. The defendant was charged with hijacking 250 cases of liquor from a truck that had broken down. In one prosecution, he was charged with robbing one of the two men in the truck and was acquitted. Subsequently, he was charged with robbing the other man, who was equally in charge of the load, and convicted. Against a double jeopardy claim of *autrefois acquit,* we rejected the argument that the robbery was "a single transaction involving the same persons and property and constituting but one offense against the State." *Id.* at 540, 115 A. at 854. Had the charge been limited to larceny, we said, the argument would have greater force, but the defendant was charged with "feloniously assaulting a named individual and taking the whiskey from him against his will," and it was "no answer to such a charge to say that he had been previously acquitted of having taken the whiskey from another person on the same occasion." *Id.* at 541, 115 A. at 854. We implicitly confirmed that view in *Brown v. State,* 311 Md. 426, 535 A.2d 485 (1988) where,

---

the person of the husband, only one robbery had occurred. In *Hawkins,* the court held that the *Crosby* definition of the allowable unit of prosecution for robbery was "contrary to the statutory and decisional law of this state" and "was incorrectly decided . . . ." *Hawkins,* 6 S.W.3d at 560.

although our focus was on the unit of prosecution for use of a handgun in the commission of a crime of violence, we noted without critical comment that the defendant had also been convicted, in each of two cases, of two counts of robbery with a deadly weapon when he broke into a house, assembled the two occupants at gunpoint, and took property belonging to them.

On this authority, we hold that the unit of prosecution for the crime of robbery is the individual victim from whose person or possession property is taken by the use of violence or intimidation. As we have held, applying those elements, that Ms. Ohler was also robbed of the wallet and its contents, the robbery conviction with respect to her may stand.

### Other Arguments of Unconstitutionality of Maryland Statute

Borchardt claims that the Maryland Death Penalty Statute is unconstitutional (1) as applied because it makes a death sentence mandatory, and (2) on its face because it requires the defendant to establish (i) any enumerated mitigating circumstances and (ii) that any non-enumerated circumstances are, in fact, mitigating. He acknowledges that we have previously rejected those very complaints, and indeed we have. His first argument was most recently considered and rejected in *Conyers v. State,* 354 Md. 132, 197–98, 729 A.2d 910, 945–46, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999). *See also Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). His second argument was most recently considered and rejected in *Ware v. State, supra,* 360 Md. 650, 712–13, 759 A.2d 764, 797.

### Cumulative Effect of Errors

Finally, Borchardt contends that the "cumulative effect" of the various errors he has alleged require the grant of a new trial or a new sentencing hearing. The most cogent response to this complaint is that we have found only one error in the entire proceeding—the admission of one of Ms. Ent's statements to the police—and we declared that to be harmless

beyond any reasonable doubt. There were no cumulative errors requiring remedy.

### Section 414(e) Review

 We have reviewed the sentence pursuant to § 414(e). We find no evidence in the record that it was imposed under the influence of passion, prejudice, or other arbitrary factor. We hold that the evidence supports the jury's finding that the two statutory aggravating factors exist, and, subject to our discussion *supra,* that "the evidence supports the jury's ... finding that the aggravating circumstances outweigh the mitigating circumstances." In that regard, we note that no mitigating circumstance was found to exist by the entire jury and that the trial judge, in her report to this Court, found that the sentence of death was justified.

JUDGMENT AFFIRMED, WITH COSTS.

Dissenting opinion by RAKER, J., in which BELL, C.J., and ELDRIDGE, J., join.

RAKER, J., dissenting:

I would hold that, based on *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), in the framework of the Maryland death penalty statute, the sentencing authority must find that aggravating factors outweigh mitigating factors beyond a reasonable doubt and not by a mere preponderance of the evidence.[1] I would find the por-

---

1. In *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980), we held that permitting the State to establish that the aggravating circumstance(s) outweighed the mitigating circumstance(s) by a preponderance of the evidence did not offend due process. *See id.* at 731, 415 A.2d at 849. *Tichnell* has been affirmed continuously by this Court in subsequent challenges. Nonetheless, *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), has changed the due process landscape in a landmark way. Dissenting in *Apprendi,* Justice O'Connor stated that *Apprendi* "will surely be remembered as a watershed change in constitutional law." *Id.* at 524, 120 S.Ct. at 2380, 147 L.Ed.2d 435 (O'Connor, J., dissenting). The present case presents the first challenge to the constitutionality of § 413(h) since *Apprendi* was

tion of Maryland Code (1978, 1996 Repl.Vol., 2001 Supp.) Art. 27, § 413(h) [2] that provides that the punishment shall be death if the sentencing authority finds that the aggravating factors outweigh the mitigating factors by a preponderance of evidence violates due process under the Fourteenth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights. Accordingly, I would sever the unconstitutional portion of the statute, require the reasonable doubt standard as a matter of law, and vacate appellant's sentence of death imposed pursuant to § 413(h).

### Summary of Argument

In Maryland, the maximum sentence for first degree murder is life imprisonment, unless certain circumstances are present and certain requirements are met. Death and life imprisonment without the possibility of parole are enhanced penalties; life imprisonment is the default penalty. Under the Maryland death penalty statute, the sentencing authority is required to make additional findings beyond that of guilt before a sentence of death may be imposed.

*Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d 435, forms the backdrop for this appeal. In *Apprendi,* the Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id. Apprendi* has attracted much attention in the legal community "and has important implications for the conduct of criminal trials and sentencing." *In Re Turner,* 267 F.3d 225, 227 (3d Cir.2001).

Under the Maryland death penalty statute, before a sentence of death may be imposed, the jury must find that the State has proven at least one aggravating factor beyond a

---

decided and the first meritorious ground for this Court to reexamine its holding in *Tichnell* in light of evolving due process standards.

**2.** Unless otherwise indicated, all statutory references are to Maryland Code (1978, 1996 Repl.Vol., 2001 Supp.) Article 27.

reasonable doubt. The jury also must find, beyond a reasonable doubt, that the defendant was a principal in the first degree. The third factor that the sentencing authority must find is that the aggravating factors outweigh the mitigating factors. In my view, *Apprendi* mandates that this last factor also be found beyond a reasonable doubt.

## I. Maryland's Statutory Scheme

The Maryland death penalty statute prescribes that "a person found guilty of murder in the first degree shall be sentenced to death, imprisonment for life, or imprisonment for life without the possibility of parole. The sentence shall be imprisonment for life *unless* ... a sentence of death is imposed in accordance with § 413 ...." § 412 (emphasis added).

Section 413 provides that, if the sentencing authority finds that the aggravating circumstances outweigh the mitigating circumstances by a preponderance of the evidence, the sentence shall be death, but, if it finds that the aggravating circumstances do not outweigh the mitigating circumstances, a sentence of death may not be imposed. *See* § 413(h). Finally, the Maryland death penalty statute requires that the Court of Appeals automatically review all death sentences and determine whether the evidence supports the sentencer's finding that the aggravating circumstances outweigh the mitigating circumstances. *See* § 414(e).

## II. Federal Due Process

In *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), the Supreme Court applied the rule announced in *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that every fact necessary to the crime charged must be proven beyond a reasonable doubt, to a Maine homicide statute that required a defendant to prove heat of passion on sudden provocation in order to negate the element of malice and reduce a charge of murder to manslaughter. In so doing, the Court held that the *Winship* rule was not limited only to those facts that constituted a crime as defined by state law because of the significance of the conse-

quences to the defendant depending on whether the fact of provocation could be proven. *See Wilbur,* 421 U.S. at 698, 95 S.Ct. at 1889, 44 L.Ed.2d 508; *cf.* maj. op. at 104. The Court explained that the rationale of *Winship* "requires an analysis that looks to the 'operation and effect of the law as applied and enforced by the state....'" *Wilbur,* 421 U.S. at 699, 95 S.Ct. at 1890, 44 L.Ed.2d 508.

The Court applied the *Winship* rule again in *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), to a Pennsylvania statute that created a mandatory minimum sentence of five years imprisonment for certain enumerated offenses if the sentencing judge found, by a preponderance of the evidence, that the defendant visibly possessed a firearm during the commission of the offense. Citing *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Supreme Court emphasized that "in determining what facts must be proved beyond a reasonable doubt the state legislature's definition of the elements of the offense is usually dispositive...." *McMillan,* 477 U.S. at 85, 106 S.Ct. at 2415, 91 L.Ed.2d 67. The Court concluded that visible firearm possession was a sentencing factor, not an element of the substantive offense, and therefore did not have to be proven beyond a reasonable doubt. As the majority recognizes, *see* maj. op. at 106 – 107, this was so because visible possession merely limited the sentencing court's discretion in selecting a penalty within the existing range of permissible sentences; it did not alter the maximum sentence for the crime committed *or expose the defendant to greater potential punishment.* *See McMillan,* 477 U.S. at 86–88, 106 S.Ct. at 2416–17, 91 L.Ed.2d 67.

In *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), the Supreme Court limited its earlier holding in *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (permitting an increased maximum sentence for recidivist offenders based on a prior conviction that was not specifically pleaded in the indictment because it was not an element of the offense), solely to recidivism as a sentencing factor. *See Jones,* 526 U.S. at 249,

119 S.Ct. at 1227, 143 L.Ed.2d 311. In reaching that conclusion, the Court set the stage for its decision in *Apprendi,* remarking in a footnote that: "under the Due Process Clause of the Fifth Amendment ..., *any fact (other than prior conviction) that increases the maximum penalty for a crime must be ... proven beyond a reasonable doubt."* *Id.* at 243 n. 6, 119 S.Ct. at 1224 n. 6, 143 L.Ed.2d 311 (emphasis added). The Court explained that these constitutional safeguards "concern not the identity of the elements defining criminal liability but only the required procedures for finding the facts that determine the maximum permissible punishment: these are the safeguards going to ... the burden of proof." *Id.*[3]

It was against this backdrop that the Supreme Court decided *Apprendi.* The *Apprendi* Court began by tracing the common law development of the definition of elements of offenses for the purpose of the guarantees of due process and trial by jury, which entitle a defendant to have every element of the crime charged proven to a jury beyond a reasonable doubt. The Court noted that *"facts that expose a defendant to a punishment greater than that otherwise legally prescribed* were by definition 'elements' of a separate legal offense." *Apprendi,* 530 U.S. at 482 n. 10, 120 S.Ct. at 2359 n. 10, 147 L.Ed.2d 435 (emphasis added). The Court found that *"Winship* 's due process associated jury protections extend, to some degree, 'to determinations that [go] not to a defendant's guilt or innocence, but simply to *the length of the sentence.'* " *Id.* at 484, 120 S.Ct. at 2359, 147 L.Ed.2d 435 (alteration in original) (emphasis added) (citations omitted). The Court made clear that *McMillan* 's holding was limited to "cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's

---

**3.** The Court also found that the Fifth Amendment to the United States Constitution required that any facts increasing the maximum penalty be charged in the indictment. *See Jones v. United States,* 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 1224 n. 6, 143 L.Ed.2d 311 (1999). The Fifth Amendment right to be indicted by a grand jury, however, has not been incorporated to apply to the states through the Fourteenth Amendment. *See Apprendi v. New Jersey,* 530 U.S. 466, 477 n. 3, 120 S.Ct. 2348, 2355 n. 3, 147 L.Ed.2d 435 (2000).

verdict...." *Id.* at 487 n. 13, 120 S.Ct. at 2361 n. 13, 147 L.Ed.2d 435.

Prior to *Jones* and *Apprendi*, the Supreme Court's due process jurisprudence had relied heavily on the formalistic, but often blurry, distinction between "elements" and "sentencing factors." In *Apprendi*, the Court provided a clear method for distinguishing sentencing factors from elements of an offense, explaining that: "the relevant inquiry is not one of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494, 120 S.Ct. at 2365, 147 L.Ed.2d 435. The Court held that "[o]ther than the fact of a prior conviction, *any fact that increases the penalty for a crime beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. at 2362–63, 147 L.Ed.2d 435 (emphasis added). In doing so, the Court discussed the important distinction between facts in aggravation of punishment and facts in mitigation, emphasizing that mitigating circumstances do not need to be proven beyond a reasonable doubt because, unlike aggravating circumstances, they do not expose a defendant to increased potential punishment. *See id.* at 490 n. 16, 120 S.Ct. at 2363, n. 16, 147 L.Ed.2d 435.

I believe that a finding that aggravating circumstances outweigh mitigating circumstances increases the penalty beyond the prescribed statutory maximum. Under § 412(b), a defendant is not "death-eligible" merely by having been found guilty of first degree murder. Rather, at the conclusion of the guilt/innocence phase and a finding of guilty of first degree murder, the defendant is eligible only for a sentence of life imprisonment. The defendant cannot receive a sentence of death unless the additional requirements of § 413 have been met, *i.e.,* that at least one aggravating factor has been proven, that the defendant is a principal in the first degree, and that the aggravating circumstance[s] outweigh any mitigating circumstances. *See* § 413(h). Just as the presence of the hate crime enhancement in *Apprendi* transformed a second degree offense into a first degree offense under the New Jersey hate

crime statute, the finding that the aggravating circumstances outweigh the mitigating circumstances transforms a life sentence into a death sentence under the Maryland death penalty statute. *Cf. Hoffman v. Arave*, 236 F.3d 523, 545–46 (Pregerson, J., concurring in result) (explaining that the presence of an aggravating circumstance under Idaho's death penalty scheme transforms a life sentence into a death sentence in the same way that the presence of the hate crime enhancement transformed the second degree offense into a first degree offense in *Apprendi*). There can be no doubt that a death sentence is an increased penalty beyond life imprisonment.

The majority asserts that "Maryland law makes death the maximum penalty for first degree murder." Maj. op. at 123. I believe that the majority is wrong. This Court, in an unanimous opinion, recently held that the maximum penalty for first degree murder is life imprisonment and that "death or life imprisonment without the possibility of parole are *'enhanced' sentences* for first degree murder, and are dependent upon special circumstances." *Johnson v. State*, 362 Md. 525, 529, 766 A.2d 93, 96 (2001).

In *Johnson*, we addressed the question of whether Maryland law authorized the imposition of a sentence of life imprisonment without the possibility of parole for a conviction for conspiracy to commit first degree murder. *See id.* at 528, 766 A.2d at 94. The State argued that the maximum penalty for conspiracy to commit murder was life without parole. We rejected the State's argument and held that, for the purposes of the limitation on sentences for inchoate offenses, the maximum sentence for murder was its "basic maximum sentence," not including "any enhanced penalty provisions." *Id.* at 530, 766 A.2d at 96. In reaching that conclusion, we reasoned:

"As shown by the language of Art. 27 § 412(b), the basic sentence for first degree murder 'shall be imprisonment for life . . . .' The greater sentences of death or imprisonment for life without the possibility of parole cannot be imposed unless certain special conditions are met. In addition to the notice requirements set forth in § 412(b), there are special

conditions for the imposition of death or life without the possibility of parole contained in other statutory provisions."

*Id.* at 529, 766 A.2d at 95 (citations omitted).[4] *Cf. Gary v. State*, 341 Md. 513, 671 A.2d 495 (1996) (holding that life imprisonment was not an illegal sentence for conspiracy to commit murder because it was the maximum penalty for the substantive crime of first degree murder).

In light of the structure of the Maryland statute governing imposition of the death penalty, and consistent with the language in *Johnson*, the finding that the aggravating circumstances outweigh the mitigating circumstances, pursuant to § 413(h), clearly exposes a defendant to an increased potential range of punishment beyond the mere conviction for first degree murder.

In keeping with *McMillan's* deference to the legislative determination of the elements of a particular crime, it is the particular structure of the Maryland statutes and rules governing imposition of the death penalty that guides the analysis of the requirements of due process under *Apprendi*. In enacting §§ 413 and 414 of the death penalty statute, the General Assembly expressed an intention to base death sentences in Maryland on a *factual finding* within the meaning of *Apprendi* in two ways: first, by mandating that the sentencer *find* that the aggravators outweigh the mitigators *by a preponderance of the evidence;* and, second, by requiring that the Court of Appeals review that factual finding for *sufficiency of the evidence.*

---

**4.** In addition to finding that the aggravating circumstances outweigh the mitigating circumstances, pursuant to § 413(h), there are other special conditions for the imposition of the enhanced penalty of death under § 412(b), including: the filing of a notice of intent to seek the death penalty, pursuant to § 412(b); a finding either that the defendant was a principal in the first degree, the murder was for-hire, or the victim was a law enforcement officer, *see* Maryland Rule 4–343(g); *State v. Colvin*, 314 Md. 1, 17–18, 548 A.2d 506, 514 (1988); and the completion of a pre-sentence investigation report by the Division of Parole and Probation. *See* Maryland Code (1957, 1999 Repl.Vol., 2001 Supp.) § 6–112 of the Correctional Services Article.

While ordinarily, the broad deference accorded to state legislatures in defining the elements of offenses under *Winship* and its progeny results in state statutes being upheld against the minimal requirements of due process, in the present case, the way that the Maryland General Assembly has chosen to define the death penalty procedures is precisely what implicates and offends the strictures of the Due Process Clause. The fact that the General Assembly prescribed a burden of proof for the weighing process of § 413(h) at all is the clearest indication that the legislature envisioned this determination as a factual finding.

The majority finds *Apprendi* inapplicable, reasoning that:

"It was not a death penalty case, it did not involve a capital punishment sentencing scheme, and the five Justices forming the majority made clear their view that the rulings enunciated in the case did *not* serve to invalidate any capital punishment laws."

Maj. op. at 104. The majority may be correct that *Apprendi* does not require the invalidation of *all* state capital punishment schemes. Unfortunately, the majority views the instant challenge to the Maryland statute as occupying the crossroads between the Supreme Court's due process jurisprudence under *Winship, Apprendi, et al.* and the Court's death penalty sentencing jurisprudence under *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), and its progeny. I disagree with that analysis.

Analytically, it is possible to find Maryland's death penalty statute violative of the guarantees of due process without offending in the slightest the holding or analysis in *Walton* and other Supreme Court capital sentencing cases. *Walton* sheds very little light on the question before this Court today. *Walton* merely held that it did not violate due process to require a defendant to shoulder the burden to prove mitigating circumstances as long as the State was required to prove the existence of aggravating circumstances. *See id.* at 650, 110 S.Ct. at 3055, 111 L.Ed.2d 511; *see also Hildwin v. Florida,* 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989)

(holding that the specific findings authorizing the imposition of a death sentence did not have to be made by a jury because the existence of aggravating factors was not an element of the offense but merely a "sentencing factor").

Maryland's death penalty statute also requires the defendant to prove the existence of mitigating circumstances, and appellant does not challenge that section of the statute here. Unlike the Arizona statute at issue in *Walton,*[5] however, Maryland's statute requires the jury to make an ultimate finding of fact regarding the balance of aggravating and mitigating circumstances. That finding increases the potential maximum penalty for the defendant and, significantly, is reviewed at the appellate level for sufficiency of the evidence.

More importantly, unlike the Arizona death penalty statute at issue in *Walton,*[6] the Maryland death penalty statute establishes life imprisonment as the basic, default maximum penalty for murder, a characteristic that makes Maryland unique among American death penalty jurisdictions. *See Johnson,* 362 Md. at 529, 766 A.2d at 96. In most states, a defendant essentially becomes "death eligible" upon conviction of a potentially capital crime, and the sentencing proceeding is merely a vehicle through which the sentencing authority selects from within a potential range of sentences, usually between life imprisonment and death. In Maryland, however, a defendant is not eligible to receive a death sentence after being

---

**5.** The Arizona capital sentencing statute requires only that the sentencing judge *consider* aggravating and mitigating circumstances; it does not require that the sentencing authority make a factual finding as to the relative weight of the two. *See* ARIZ.REV.STAT. § 13–703 (1989).

**6.** The Arizona death penalty statute states only that: "[a] person guilty of first degree murder ... shall suffer death or imprisonment ... for life as determined and in accordance with the procedures provided...." ARIZ.REV.STAT. § 13–703(A) (1989). The statute further provides that, "[i]n determining whether to impose a sentence of death or life imprisonment, the court shall take into account the aggravating and mitigating circumstances ... and shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated ... and that there are no mitigating circumstances sufficiently substantial to call for leniency." § 13–703(E).

convicted of first degree murder. Rather, certain additional conditions must be met, including a finding by the sentencing authority that the aggravating circumstances outweigh the mitigating circumstances. *See id.* at 529, 766 A.2d at 96. As a result, in Maryland, the finding that aggravators outweigh mitigators is much more akin to the finding that aggravating circumstances exist, which must be proven beyond a reasonable doubt, than it is to a finding that there are mitigating circumstances to be considered. Within the holding of *Apprendi*, therefore, due process requires that it be made beyond a reasonable doubt.

In addition, the majority overstates the continued authority of *Walton* by referring to what it characterizes as the "unequivocal statement by the *Apprendi* majority that its decision did not render invalid State capital sentencing schemes, such as approved in *Walton*, that allowed the judge, not sitting as the trier of fact, to find and weigh specific aggravating factors." Maj. op. at 121. *Apprendi* did not have a clear majority on the issue of whether *Walton* survived *Apprendi*. The four judge *plurality* attempted to distinguish *Apprendi* from *Walton*. *See Apprendi*, 530 U.S. at 496–97, 120 S.Ct. at 2366, 147 L.Ed.2d 435.[7] Justice Thomas, in his concurring opinion, acknowledged the tension between *Apprendi* and *Walton*, but ultimately concluded that *Walton*'s continued viability was "a question for another day." *Id.* at 523, 120 S.Ct. at 2380, 147 L.Ed.2d 435 (Thomas, J., concurring). The four-judge dissent argued that *Apprendi* directly conflicted with *Walton*. *See id.* at 538, 120 S.Ct. at 2388, 147 L.Ed.2d 435 (O'Connor, J., dissenting).

---

7. Interestingly, Justice Stevens, who wrote the *Apprendi* plurality, seemed to indicate in his concurring opinion in *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) that, to the extent that *Walton* contradicted with the principle that it was unconstitutional for a legislature to remove from a jury's assessment facts that increase the prescribed range of penalties, it should be reconsidered. *See Jones*, 526 U.S. at 253, 119 S.Ct. at 1229, 143 L.Ed.2d 311 (Stevens, J., concurring).

Furthermore, the *Apprendi* plurality's reasoning for *why* it did not conflict with *Walton,* if anything, supports my view. The Court reasoned that *Apprendi* did not conflict with *Walton,* with respect to capital sentencing schemes, because, under the Arizona death penalty scheme at issue in *Walton,* once the jury had found the defendant guilty of all of the elements of first degree murder, the defendant was death-eligible, leaving to the sentencing judge only the determination of what penalty to impose within a range of penalties for which the maximum sentence had already been established. *See id.* at 496–97, 120 S.Ct. at 2366, 147 L.Ed.2d 435. That is not the case under the Maryland death penalty statute. *See Johnson,* 362 Md. at 529, 766 A.2d at 96.

The majority emphasizes the Supreme Court's statement in *Walton* that aggravating facts falling within the traditional scope of capital sentencing merely guide a choice between a greater and lesser penalty, but do not raise the ceiling of the available sentencing range. *See* maj. op. at 112. The majority also repeatedly stresses that *Apprendi* does not forbid a judge to exercise sentencing discretion within a statutory range of punishments. *See* maj. op. at 113–114. I do not dispute either of these propositions.

Nonetheless, it bears repeating that appellant's challenge is not to all capital sentencing statutes, but to Maryland's particular statutory scheme. Section 412 prescribes that the penalty for first degree murder "shall be imprisonment for life unless ... a sentence of death is imposed in accordance with § 413 ...." § 412(b). As such, the Maryland capital sentencing scheme establishes life imprisonment as the default punishment for first degree murder, and the maximum sentence is increased only if the sentencing authority finds that the aggravating circumstances outweigh the mitigating circumstances. Therefore, the Maryland General Assembly, in enacting § 412, has defined the offense of capital murder in Maryland in such a way that its particular elements must be proven beyond a reasonable doubt.

The majority asserts that "[i]f it is permissible under *Apprendi* for the law to remove [the] fact-finding and fact-weighing process *entirely* from the jury and leave it to the judge as a legitimate sentencing factor, without specifying a reasonable doubt standard, it can hardly be impermissible for a jury that has found the prerequisite aggravating factors beyond a reasonable doubt to apply a preponderance standard in weighing them against any mitigating circumstances." Maj. op. at 121–122.[8] The majority concludes: "The *Walton* scheme ... is in far greater direct conflict with the underpinning of *Apprendi* than the Maryland approach.... *If Apprendi renders the Maryland law unconstitutional, then, perforce, it likely renders most of the capital punishment laws in the country unconstitutional.*" *Id.* at 122 (emphasis in original). I disagree. The Supreme Court's jurisprudence has consistently emphasized the important role that is played by the particular choices made by state legislatures in defining elements of offenses for the purposes of due process analysis. *See, e.g., McMillan,* 477 U.S. at 85, 106 S.Ct. at 2415, 91 L.Ed.2d 67. The majority's fallacy is in characterizing Maryland's statutory death penalty scheme as somehow being merely a subset or permutation of the schemes upheld in *Walton, Hildwin,* etc. It is not.

Unlike most states that establish a punishment range of life imprisonment to death for first degree murder and then delegate to the sentencing authority the choice between the

---

8. The dissent in *Apprendi* made a similar complaint about the hate crime statute at issue there, accusing the majority of engaging in a meaningless, formalistic analysis of the statute by pointing out that the New Jersey legislature could simply have rewritten the statute so that the maximum penalty for weapons possession was twenty years with a lesser sentence of ten years if the sentencing authority failed to find, by a preponderance of the evidence, that there was hate bias. *See Apprendi v. New Jersey,* 530 U.S. 466, 541, 120 S.Ct. 2348, 2389–90, 147 L.Ed.2d 435 (2000) (O'Connor, J., dissenting). The *Apprendi* majority responded to that complaint by pointing out that the form of particular sentencing statutes reflect substantive policy decisions by state legislatures. *See id.* at 490 n. 16, 120 S.Ct. at 2363 n. 16, 147 L.Ed.2d 435. It is this legislative decision making to which the Court has repeatedly shown deference in its due process jurisprudence under *Winship* and its progeny.

two based upon a normative judgment, the Maryland statute prescribes that the penalty for first degree murder is life imprisonment, *unless* a series of additional conditions are met, including the weighing of aggravating and mitigating circumstances mandated by § 413. *See* § 412(b). Death sentences are then automatically reviewed by this Court for sufficiency of the evidence. *See* § 414(e). The General Assembly could not have conceived of this sentencing determination as the type of "purely judgmental" choice, *see* maj. op. at 126, within a range of permissible sentences, like the statutes at issue in *Walton,* etc., but rather established a death sentence as an enhanced penalty based upon the establishment of additional facts (namely, that there are aggravating circumstances that outweigh mitigating circumstances) by a particular standard of proof that is reviewable, as a matter of law, at the appellate level. It is this fact-finding process that brings § 413 within the strictures of *Apprendi* and the Due Process Clause, even though it is still an open question whether statutes like the one upheld in *Walton* will survive Supreme Court review after *Apprendi.* The majority concedes as much, characterizing "the determination whether aggravating or mitigating circumstances exist" as being "in the nature of a fact-finding process, in which the ultimate determination must be based on evidence." Maj. op. at 126. Nonetheless, the majority concludes that "[n]otwithstanding the language in § 413(e)(3) directing this Court, on appellate review, to determine whether 'the evidence supports the jury's ... finding that the aggravating circumstances outweigh the mitigating circumstance,' the weighing process is not a fact-finding process. This is a process that not only traditionally, but quintessentially, is a pure and Constitutionally legitimate sentencing factor, one that does not require a determination to be made beyond a reasonable doubt." *Id.* at 126–127.

First, this interpretation of the Maryland death penalty statute is in direct contravention of the plain language and structure of the statute. Second, this conclusion relies on a cursory interpretation of what the *Apprendi* majority meant when it discussed "factual findings" that expose a defendant to

greater punishment. The purpose of *Apprendi's* functional, rather than purely formal, definition of *elements* of an offense was to make clear that courts should look beyond the textual, theoretical maximum penalties available for a predefined crime to the more fundamental inquiry of whether additional findings are necessary to increase the penalty for that crime. Third, the fact that the ultimate determination of the balance of aggravating and mitigating circumstances in a capital sentencing proceeding is not entirely like any other determination in the criminal justice system is not a valid reason to refuse to apply *Apprendi's* protections to that decision. As the New Jersey Supreme Court explained in *State v. Biegenwald,* 106 N.J. 13, 524 A.2d 130 (1987):

"In no proceeding is it more imperative to be assured that the outcome is fair than in [the determination that the aggravating factors outweigh the mitigating factors].... We speak here about the ultimate value judgment, the ultimate question of life or death, for while the formulation is in terms of 'beyond a reasonable doubt,' and therefore appropriately applicable to fact-finding, the weighing process really is not fact-finding at all but a judgmental determination by the jury, based on conflicting values, of whether defendant should live or die.... If anywhere in the criminal law a defendant is entitled to the benefit of the doubt, it is here."

*Id.* at 156 (citations omitted).

The majority makes a point to emphasize that *Apprendi* "did not involve a capital punishment sentencing scheme...." Maj. op. at 104. Nonetheless, *Apprendi's* logic is equally applicable to the operation of the Maryland death penalty statute at issue in this case. The fact that the definition of the offense of capital murder occurs within the context of a capital sentencing statute, rather than a hate crimes or carjacking statute, is not dispositive of the due process issue. Such analysis is precisely the type of mere "formalism" against which the Court warned in *Wilbur. See Wilbur,* 421 U.S. at 700, 95 S.Ct. at 1890, 44 L.Ed.2d 508.

The United States Supreme Court repeatedly has stated that death is different. The reason why death is different is reiterated throughout the Court's death penalty jurisprudence. *See e.g., Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). The Court has recognized "that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California v. Ramos,* 463 U.S. 992, 998–999, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171 (1983). The Court has noted the obvious: that death is different because it is irreversible. This aspect of the difference between death and other penalties merits particularly careful review of the fairness of the trial, the accuracy of the fact-finding process, and the fairness of the sentencing procedure imposing the death penalty. Even a cursory review of Supreme Court death penalty jurisprudence leads to the inescapable conclusion that capital sentencing proceedings are to be subjected to a heightened degree of scrutiny out of concern for the reliability of their outcomes. *See Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978); *Woodson,* 428 U.S. at 305, 96 S.Ct. at 2991, 49 L.Ed.2d 944 ("Death in its finality, differs from life imprisonment more than a hundred-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."). As the Court explained in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988):

"The decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make. Evolving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case."

*Id.* at 383–84, 108 S.Ct. at 1870, 100 L.Ed.2d 384. As Chief Justice Quinn of the Colorado Supreme Court explained in *State v. Tenneson,* 788 P.2d 786 (Colo.1990):

"The elevated standard of reliability applicable to a capital sentencing proceeding is nothing less than constitutional acknowledgment that there is a qualitative difference between death and other forms of punishment and that this qualitative difference necessitates a 'corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' "

*Id.* at 804 (Quinn, C.J., concurring in part and dissenting in part) (quoting *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1988)). The majority turns this concern with heightened reliability on its head by suggesting that capital sentencing procedures should somehow constitute an exception to the values of fairness protected by the Due Process Clause.

The majority also devotes a great deal of time to discussing post-*Apprendi* challenges to other states' death penalty statutes. To a great extent, however, those cases are not persuasive because, as indicated in discussion *supra* pp. 104 – 109, they involve death penalty statutes that are significantly different in structure and application than the Maryland statute.

The majority begins with a discussion of *State v. Hoskins,* 199 Ariz. 127, 14 P.3d 997 (2000), claiming that, despite its awareness of *Apprendi,* the Arizona Supreme Court dismissed the challenge on the basis of *Walton. See* maj. op. at 116 – 117. In that case, the court dealt with the relationship between *Walton* and *Apprendi* in a footnote only, stating specifically that the precise issue had not been raised, briefed, or argued in *Hoskins,* so that the court remained bound by *Walton's* holding that a judge could constitutionally determine the presence of aggravating circumstances "until the Arizona death penalty statutes are fully analyzed under *Apprendi* and a final determination is made by the Supreme Court...." *Hoskins,* 14 P.3d at 1016 n. 5. In addition, the Arizona death penalty statute (which was upheld in *Walton)* is structured significantly differently than the Maryland statute for the purposes of due process analysis. The Arizona statute provides that a person guilty of first degree murder shall suffer death or life imprisonment at the discretion of the sentencing

authority. *See* ARIZ.REV.STAT. § 13–703(A) (1999). It also provides that, in determining whether to impose a sentence of death or life imprisonment, the sentencing court shall merely "take into account" aggravating and mitigating circumstances and that the court must impose a death sentence if it finds aggravating circumstances and no mitigating circumstances sufficiently substantial to call for leniency. *See* § 13–703(E).

The California statute at issue in *People v. Anderson*, 25 Cal.4th 543, 106 Cal.Rptr.2d 575, 22 P.3d 347 (2001), cited by the majority, is also structured like the Arizona statute upheld in *Walton* and *Hoskins*, not like the Maryland statute. The California death penalty statute provides that the trier of fact choose between possible sentences of death or life imprisonment and that, in doing so, the trier of fact shall simply "consider, take into account and be guided by the aggravating and mitigating circumstances" and "impose a sentence of death if ... the aggravating circumstances outweigh the mitigating circumstances." CAL.PENAL CODE § 190.3 (West 2001). In other words, as the court in *Anderson* articulated, the sentencing authority in California engages in an "essentially normative determination," *Anderson*, 106 Cal.Rptr.2d 575, 22 P.3d at 378, under a statutory scheme in which death is the prescribed statutory maximum penalty for first degree murder and life imprisonment is the minimum sentence, such that "facts which bear upon, but do not necessarily determine, which of these two alternate penalties do not come within the holding of *Apprendi*." *Id.* 106 Cal.Rptr.2d 575, 22 P.3d at 378 n. 14. As explained *supra*, the same analysis does not apply to the Maryland statute.

The weighing provision of the statute at issue in *Weeks v. State*, 761 A.2d 804 (Del.2000) is perhaps the closest in similarity to the Maryland death penalty, in that it requires the sentencing authority to find that the aggravating circumstances outweigh the mitigating circumstances by a preponderance of the evidence. *See* DEL.CODE ANN. tit. 11, § 4209 (2000). Nonetheless, the Delaware Supreme Court's holding in *Weeks* is inapposite for two reasons. First, the defendant in *Weeks* was not challenging the weighing portion of Dela-

ware's death penalty statute; he was challenging the portion of the statute that permits the trial judge to find statutory aggravating factors without being bound by a jury verdict on allegedly underlying issues of fact, and the court's holding was limited to the finding of enumerated aggravating factors. *See* § 4209 (providing that the jury report to the judge its final vote on whether the evidence shows the existence of an aggravating factor beyond a reasonable doubt, which the trial judge then considers in independently establishing the existence of at least one statutory aggravator beyond a reasonable doubt); *Weeks,* 761 A.2d at 806. Second, and more importantly, the Delaware statute prescribes that the punishment for first degree murder is death or life imprisonment without parole. *See* § 4209. It does not establish life imprisonment as the default or basic maximum sentence, which is later "enhanced" based on additional factual findings, the way that the Maryland statute does.

The reasoning in *United States v. Allen,* 247 F.3d 741 (8th Cir.2001), also cited by the majority, if anything, supports the position that I take in this dissent. In that case, the United States Court of Appeals for the Eighth Circuit dealt with the question of whether *Apprendi* required that the mental culpability factors and statutory aggravating factors on which the government relied in seeking the death penalty be charged in an indictment and submitted to a Grand Jury under the Fifth Amendment's Indictment Clause. *See* U.S. CONST., amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury. . . ."). The court held that mental culpability and aggravating circumstances need not be alleged in the indictment because they were not elements of the underlying offense. In particular, the court held that those factors were not elements of the crime because they were not the basis for increasing the maximum punishment. *See Allen,* 247 F.3d at 763. In doing so, however, the court based its decision on the unique structure of the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3591 (1994), finding that the death penalty was the "first" or "baseline" punishment authorized by FDPA and that

permitting a jury to sentence a defendant convicted under FDPA to life imprisonment was a "sentencing protection[ ]" to "shield a defendant from automatically receiving the statutorily authorized death sentence." *Allen,* 247 F.3d at 763. The court rejected the appellant's argument that a life sentence was the initial baseline from which the jury's sentencing determinations under FDPA were viewed because it found that "the statutes at issue expressly authorize a maximum penalty of death and the sentencing factors of mental culpability and aggravating circumstances do not increase the sentencing range but rather provide the particularized standards for choosing which of the alternative available sentences should be imposed." *Id.* The court concluded:

> "The fact-finding barrier that exists between a jury verdict that a defendant is *guilty of a capital crime* for which one punishment is known to be death and a court's ability to impose that capital punishment, *id.,* acts to protect the defendant from an automatic death sentence. Because of *the unique context of this scheme,* and because the statutes of conviction authorize a penalty of death, we hold that failure to allege the mental culpability and statutory aggravating factors in a capital defendant's original indictment does not violate the Fifth Amendment's Indictment Clause."

*Id.* at 763–64 (emphasis added). This reasoning cannot control our decision regarding the Maryland death penalty statute because this Court specifically held in *Johnson* that the basic maximum sentence for murder under § 412(b) is life imprisonment and a death sentence was an enhanced penalty dependent upon special circumstances. *See* discussion, *supra,* p. 155.

The Florida Supreme Court applied reasoning in its decision in *Mills v. Moore,* 786 So.2d 532 (2001), that was similarly inapplicable to the Maryland death penalty statute given this Court's decision in *Johnson.* In that case, the court found *Apprendi* inapplicable to Florida's death penalty statute because "[t]he plain language of [the statute] is clear that the maximum penalty available for a person *convicted of a capital felony* is death." *Id.* at 538 (emphasis added). In so doing,

the court relied specifically on the plain meaning of the language of "capital felony" employed in its statute,[9] concluding that "a 'capital felony' is by definition a felony that may be punishable by death. The maximum possible penalty described in the capital sentencing scheme is clearly death." *Id.* This reasoning is in direct contrast to Maryland law, under which life imprisonment is the maximum sentence for first degree murder, absent a sentencing enhancement based on special circumstances. The Florida Supreme Court also relied on the fact that the United States Supreme Court had not overruled *Walton* or *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), in which Florida's sentencing scheme was upheld. *See Mills,* 786 So.2d at 537. Unfortunately, however, the court did so, in part, by relying inappropriately on the fact that the Supreme Court had denied certiorari in several state supreme court cases finding *Apprendi* inapplicable to their capital sentencing schemes, finding that "[t]he Supreme Court's denial of certiorari indicates that the Court meant what it said when it held that *Apprendi* was not intended to affect capital sentencing schemes." *Id. See Bethley v. Louisiana,* 520 U.S. 1259, 117 S.Ct. 2425, 138 L.Ed.2d 188 (1997) (explaining that it is well settled that the Supreme Court's decision to deny certiorari "does not in any sense constitute a ruling on the merits of the case in which the writ is sought"); *Barber v. Tennessee,* 513 U.S. 1184, 115 S.Ct. 1177, 130 L.Ed.2d 1129 (1995) (restating the "settled proposition" that a denial of certiorari "does not constitute a ruling on the merits"); *see also* discussion, *supra,* pp. 106 – 110.

*State v. Golphin,* 352 N.C. 364, 533 S.E.2d 168 (2000), is also inapposite. *Golphin* dealt with the issue of whether due

---

**9.** The relevant portion of Florida's death penalty statute, in effect at the time of Mills's conviction, read:

"A person who has been convicted of a capital felony shall be punished by life imprisonment and shall be required to serve no less than 25 years before becoming eligible for parole unless the proceeding held to determine sentence ... results in finding by the court that such person shall be punished by death, and in the latter event such person shall be punished by death."

FLA. STAT. ANN § 775.082(1) (1979).

process required that an indictment include aggravating circumstances, concluding that it did not. The court found that the notice of intent to seek the death penalty was sufficient. *See id.* at 193. The court based its conclusion on the holding that aggravating circumstances are not elements under *Apprendi. See id.* at 193–94. Once again, the North Carolina death penalty statute is fundamentally different from the Maryland scheme. The North Carolina statute provides that, once a defendant has been convicted of "a capital felony," a sentencing proceeding is conducted to determine whether the defendant should be sentenced to death or life imprisonment. *See* N.C. GEN.STAT. § 15A–2000 (a)(1) (2000). In addition, unlike the Maryland statute, in North Carolina, aggravating and mitigating circumstances are merely "considerations" for the sentencing authority in selecting a sentence within a permissible range. *See* § 15A–2000 (b).

The Missouri Supreme Court's decision in *State v. Storey,* 40 S.W.3d 898 (Mo.2001), is particularly inapposite to the issue in this case, in that it dealt with the application of the Double Jeopardy Clause to a capital sentencing proceeding in which the court submitted to the sentencing jury an aggravating factor that a prior sentencing jury had failed to find. *See id.* at 914. The court held that the submission of the aggravating circumstance at the subsequent sentencing hearing did not violate double jeopardy, under *Poland v. Arizona,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), and that *Apprendi* did not affect *Poland.* That holding in no way sheds light on the question of whether *Apprendi* requires that the finding that aggravating circumstances outweigh mitigating circumstances under the Maryland statute must be done beyond a reasonable doubt.

*Hoffman* did not deal with the precise *Apprendi* challenge at issue in this case, a challenge to the weighing portion of Idaho's death penalty statute, but rather involved a challenge to the portion of the statute that mandates that a judge, rather than a jury, determine the presence of an aggravating circumstance in order for a defendant to be eligible for a death sentence. *See* IDAHO CODE § 19–2515(c); *Hoffman,* 236 F.3d

at 542. Nonetheless, in reaching its decision that the Idaho death penalty statute was not unconstitutional, while conceding that *Apprendi* may raise some doubt about the continued vitality of *Walton,* the United States Court of Appeals for the Ninth Circuit concluded that, absent clear direction from the Supreme Court, *Walton* foreclosed an *Apprendi*-based challenge to Idaho's capital sentencing scheme. *See Hoffman,* 236 F.3d at 542. Judge Pregerson did not join in this one holding of the court, insisting that *Apprendi* required a reconsideration of *Walton*'s continued viability.[10] *See id.* at 543 (Pregerson, J., concurring). Judge Pregerson's analysis is particularly compelling in light of this Court's previous interpretation of the Maryland statute in *Johnson:*

"Under Idaho's death penalty scheme, a defendant is not actually 'death-eligible' after a jury convicts him of first degree murder. Rather, at the conclusion of the first degree murder conviction, the defendant is only eligible for a sentence of life imprisonment. Idaho Code § 19–2515(c). The defendant is not death-eligible until the trial judge finds the presence of an aggravating circumstance. *Id.* If the trial judge finds an aggravating circumstance, the judge then has the task of weighing the statutory aggravating circumstance against all of the mitigating evidence to determine if the defendant should receive life in prison or the death penalty. *Id.*

"Just as the presence of the hate crime enhancement transformed a second degree offense sentence into a first degree offense sentence under the New Jersey hate crime statute, the presence of an aggravating circumstance here transforms a life sentence into a potential death sentence under the Idaho death penalty statute. There can be no doubt that a death sentence is an increased penalty beyond life imprisonment. It is equally clear that the presence or

---

**10.** Judge Pregerson authored the majority opinion for the court, except for the part of the opinion relating to the *Apprendi* issue, which was authored by Judge Gould, and in which Judge Pregerson concurred separately in the result. *See Hoffman v. Arave,* 236 F.3d 523, 543 (9th Cir.2001) (Pregerson, J., concurring).

absence of an aggravating circumstance is a factual determination. I would therefore conclude that the determination of the presence or absence of an aggravating circumstance in a capital case is a factual determination that increases the potential sentence from life imprisonment to capital punishment, and thus must be submitted to the jury under *Apprendi*."

*Id.* at 546–47 (Pregerson, J., concurring in result) (internal footnote omitted).[11]

Finally, the majority takes comfort in the recent decision by the United States Court of Appeals for the Fourth Circuit, in *Burch v. Corcoran,* 273 F.3d 577 (4th Cir.2001). *See* maj. op. at 115. At the outset, it is important to note that the United States District Court for the District of Maryland held that the appellant's *Apprendi* claim was barred by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *See* Brief for Appellant at 19 n. 4, *Burch v. Corcoran,* 273 F.3d 577 (4th Cir. 2001) (citing *Burch v. Kavanagh,* No. MJG–98–4054 (D.Md. Aug. 18, 2000) (unpublished Memorandum of Decision denying habeas corpus relief)). The court of appeals agreed, holding that "[b]ecause his judgment of conviction was final well before the [Supreme] Court's decision in *Apprendi,* and because *Apprendi* does not apply retroactively to cases pending on collateral review, Burch cannot obtain any federal habeas corpus relief under *Apprendi.*" *Burch,* 273 F.3d at 584. As the majority concedes, *see* maj. op. at 115–116, the court of appeals did not reach the merits of the appellant's *Apprendi* challenge, finding it to be precluded by retroactivity

---

11. The relevant portion of the Idaho death penalty statute provides that: "Where a person is convicted of an offense which may be punishable by death, a sentence of death shall not be imposed unless a notice of intent to seek the death penalty was filed and served ... and the court finds at least one (1) statutory aggravating circumstance. Where the court finds a statutory aggravating circumstance the court shall sentence the defendant to death unless the court finds that mitigating circumstances which may be presented are sufficiently compelling that the death penalty would be unjust." IDAHO CODE § 19–2515(c) (2000).

doctrine.[12] *See Burch,* 273 F.3d at 584. Nonetheless, the court, in dicta, in a two paragraph footnote and with little analysis, states that, in determining that a death sentence was warranted using a preponderance standard, the jury "was simply selecting the appropriate sentence from a range of penalties that already included the death penalty." *Id.* at 584 n. 6. It is highly significant to the analysis, however, that neither the parties nor the court even cited, much less discussed, *Johnson* in their briefs or opinion.[13]

---

**12.** The Fourth Circuit's holding that *Apprendi* does not apply retroactively has no relevance here, since this is a direct appeal in Maryland state courts. As a matter of Maryland law, the *Apprendi* decision is fully applicable to Borchardt. Furthermore, under the Maryland Uniform Postconviction Procedure Act, the standard for retroactive application is whether the Supreme Court decision in *Apprendi* "imposes upon State criminal proceedings a procedural or substantive standard not previously recognized; and the standard is intended to be applied retrospectively and would thereby affect the validity of the petitioner's conviction or sentence." Maryland Code (1957, 2001 Repl.Vol.) § 7-106(c)(2) of the Criminal Procedure Article. *See Jones v. State,* 314 Md. 111, 112, 549 A.2d 17, 17 (1988); *State v. Colvin,* 314 Md. 1, 24–25, 548 A.2d 506, 517–18 (1988).

**13.** Significantly, the standard of review discussed by the court of appeals and applied in its evaluation of the appellant's *Apprendi* claim is of critical importance to the persuasive value of the court's dicta. As the court of appeals pointed out, the standard of review applied by federal courts when reviewing the decisions of state courts—namely, the prior decisions by this Court in *Burch v. State,* 346 Md. 253, 696 A.2d 443 (1997) (*Burch I*) (affirming the appellant's convictions), and *Burch v. State,* 351 Md. 731, 720 A.2d 322 (1998) (*Burch II*) (denying appellant's application to appeal the denial of postconviction relief)—is highly deferential. Because this Court, in *Burch I,* specifically addressed the appellant's challenge to the allocation of the burdens of proof in his capital sentencing hearing under the Maryland death penalty statute and held that the State did not have to prove beyond a reasonable doubt that the death penalty should be imposed, *see Burch,* 346 Md. at 297, 696 A.2d at 465, under 28 U.S.C. § 2254(d) (Supp. 2001), a federal court could only grant a writ of habeas corpus if this Court's decision in that case was contrary to or an unreasonable application of *clearly established federal law, as determined by the United States Supreme Court. See Burch,* 273 F.3d at 583. Because of the stringent requirements of the federal doctrine of retroactivity on habeas corpus review of state court decisions, the Fourth Circuit's unwillingness to address and uphold Burch's challenge to the weighing portion of Maryland's death penalty statute should not be read as persuasive

The majority and I agree on at least one point, namely, that the State need not charge in the indictment that the aggravating circumstances that it alleges outweigh any mitigating circumstances. I do not agree, however, with the majority's view that the "incongruity of applying *Apprendi* to this process is particularly apparent with respect to the requirement that, if the determination that aggravating circumstances outweigh mitigating circumstances is treated as an element that must be proved by the State beyond a reasonable doubt, it also must be sufficiently alleged in the indictment." Maj. op. at 127. There is no need to allege intent to seek the death penalty in an indictment, or to include aggravating factors and mitigating factors in an indictment, because the Fourteenth Amendment has never been construed to include the Fifth Amendment right to "presentment or indictment of a Grand Jury." *See Apprendi,* 530 U.S. at 476 n. 3, 120 S.Ct. at 2355 n. 3, 147 L.Ed.2d 435. Furthermore, adequate notice, for the purpose of due process analysis, is provided for in the requirement that the State file a notice of its intent to seek the death penalty. *See* § 412(b)(1). Simply because the indictment ramifications of *Apprendi* are inapplicable to Maryland death penalty cases does not mean that the logic is also inapplicable.

### III. State Constitutional Grounds

"Justice is the objective of Maryland's judicial process. The process reaches for this objective by seeking the truth. It seeks the truth by means of a fair trial." *Jackson v. State,* 322 Md. 117, 119, 586 A.2d 6, 6 (1991).

The relevant portion of Article 24 of the Maryland Declaration of Rights provides: "That no man ought to be ... deprived of his life, liberty or property, but ... by the law of the land." The weighing provision of the Maryland death penalty statute, § 413(h), also violates Article 24 and the basic principles of fundamental fairness guaranteed by the state

authority in our consideration of Borchardt's claims on his direct appeal.

constitution and as reflected in Maryland common law. Although this Court has generally interpreted Article 24 in *pari materia* with the Due Process Clause of the Fourteenth Amendment,[14] we have interpreted it more broadly in instances where fundamental fairness demanded that we do so. In one such instance, we recognized the common law doctrine of fundamental fairness in criminal cases as a limitation on prosecutorial discretion to enter a *nolle prosequi* that was broader than the protection afforded by the Due Process Clause of the United States Constitution. *See Hook v. State,* 315 Md. 25, 43–44, 553 A.2d 233, 242–43 (1989) (holding that permitting the prosecution to *nol pros* a lesser included offense was "fundamentally unfair under Maryland common law"). We also applied the Maryland common law principles of fundamental fairness to merge two offenses even though merger was not required by the required evidence test as enunciated in *White v. State,* 318 Md. 740, 569 A.2d 1271 (1990) (explaining that the normal standard governing merger of offenses in Maryland is the *Blockburger* required evidence test). *See Monoker v. State,* 321 Md. 214, 582 A.2d 525 (1990). In *Monoker,* we based our application on the principle that "[o]ne of the most basic considerations in all our decisions is the principle of fundamental fairness in meting out punishment for a crime." *Id.* at 223, 582 A.2d at 529. Certainly, if anything, meting out the ultimate punishment, "the most solemn and final act that the state can take against an individual," *State v. Wood,* 648 P.2d 71, 80 (Utah 1982), should demand the ultimate attention to principles of fairness. *See*

---

14. While this Court has generally looked for guidance to the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and the federal court decisions interpreting them in delineating the scope of Article 24 protection in Maryland, *see Crawford v. State,* 285 Md. 431, 452 n. 3, 404 A.2d 244, 254 n. 3 (1979), such federal jurisprudence has been used for guidance only and does not compel the result that I suggest in this section. *Cf. Hook v. State,* 315 Md. 25, 43, 553 A.2d 233, 242–43 (1989). Rather, I suggest that § 413(h) independently violates Maryland Declaration of Rights Article 24. *See Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983); *Perry v. State,* 357 Md. 37, 85 n. 11, 741 A.2d 1162, 1188 n. 11 (1999).

*Tenneson,* 788 P.2d at 794 ("These considerations [of fairness] assume profoundly greater importance in the process of determining whether a person convicted of murder shall be sentenced to death."); *Wood,* 648 P.2d at 81 ("Nowhere in the law is the interplay of procedural rules and substantive standards more critical than in the penalty phase of a capital case.").

In *Wadlow v. State,* 335 Md. 122, 642 A.2d 213 (1994), prior to the Supreme Court's decisions in *Jones* and *Apprendi,* we explained that, despite the fact that federal courts had uniformly held that predicate facts required for imposition of enhanced sentences did not have to be found by a jury beyond a reasonable doubt, Maryland had generally drawn a distinction between sentence enhancement provisions that were dependent upon the prior conduct of the offender and those that were dependent upon the circumstances of the offense. *See id.* at 128–29, 642 A.2d at 216. We concluded, therefore, that, although not then required by the federal constitution, under Maryland law, where the legislature has prescribed different sentences for the same offense, depending upon a particular circumstance of the offense, the presence of that circumstance had to be determined by the trier of fact applying the reasonable doubt standard. *See id; cf. Jones v. State,* 324 Md. 32, 37, 595 A.2d 463, 465 (1991) ("Where the General Assembly has required or permitted enhanced punishment for multiple offenders, the burden is on the State to prove, by competent evidence and beyond a reasonable doubt, the existence of all of the statutory conditions precedent for the imposition of enhanced punishment."); *Spratt v. State,* 315 Md. 680, 556 A.2d 667 (1989) (holding that the value of the property destroyed was an element of malicious destruction of property that had to be determined by a jury beyond a reasonable doubt). Our reasoning was based in part on the conclusion that enhanced punishment statutes are highly penal and, therefore, must be strictly construed. *See Jones,* 324 Md. at 38, 595 A.2d at 466.

Long before the Supreme Court decided *Jones* and *Apprendi,* these Maryland cases established the principle, under Maryland law, that any fact relating to the circumstance of an offense that exposed a defendant to enhanced punishment had

to be determined by the trier of fact beyond a reasonable doubt. Thus, Article 24 of the Maryland Declaration of Rights, in conjunction with this Court's holding in *Johnson* that life imprisonment is the basic statutory penalty for first degree murder and that life imprisonment without parole and the death penalty constitute enhanced sentences, constitutes an independent and adequate state law ground for invalidating the provision of the Maryland capital sentencing scheme that provides that the aggravating factors need outweigh the mitigating factors only by a preponderance of the evidence *See Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983).

Allowing a jury to sentence a defendant to death based on only a preponderance of the evidence that the aggravating circumstances outweigh the mitigating circumstances offends the same principles of fundamental fairness articulated in our jurisprudence.

One purpose that is served by requiring the jury to find that aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt is "to communicate to the jurors the *degree of certainty* that they must possess ... before arriving at the ultimate judgment that death is the appropriate penalty." *Tenneson*, 788 P.2d at 794 (emphasis added). In that way, "the beyond a reasonable doubt standard as applied to the weighing of aggravating and mitigating factors serves to assure the degree of *reliability* necessary to support a verdict of death in a sentencing proceeding." *Id.* (emphasis added). As the Utah Supreme Court explained: "The reasonable doubt standard ..., which is only used when the most basic interests of the individual are at stake, ... conveys to the decision maker a sense of the solemnity of the task and the necessity for a high degree of certitude, given the nature of the value to be weighed, in imposing the death sentence." *Wood*, 648 P.2d at 84.

Several state supreme courts have found, on independent state law grounds, prior to the Supreme Court's decision in *Apprendi*, that considerations of fundamental fairness require

that the ultimate weighing determination in capital sentencing proceedings be made beyond a reasonable doubt. *See Biegenwald,* 524 A.2d at 151, 156; *Wood,* 648 P.2d at 71.

Several states require, in their capital punishment statutes, that the determination that aggravators outweigh mitigators be made beyond a reasonable doubt. *See* ARK.CODE ANN. § 5–4–603(a)(2) (Michie 1997); N.J. STAT. ANN. § 2C:11–3.2 (3) (West 1995); N.Y.CRIM. PROC. LAW § 400.27(11)(a) (McKinney 2000); OHIO REV.CODE ANN. § 2929.03(d)(1) (West 1994); TENN. CODE ANN. § 39–13–204(f)(2) (1997); UTAH CODE ANN. § 76–3–207(4)(b) (2001); WASH. REV.CODE § 10.95.050(b) (2001). There are also a multitude of situations, involving penalties far less severe than the ultimate penalty at stake under § 413, where we have required determinations to be made by more than a preponderance of the evidence. *See, e.g., 1986 Mercedes v. State,* 334 Md. 264, 638 A.2d 1164 (1994) (requiring the state to prove the requisite elements under drug forfeiture laws by clear and convincing evidence); *Mack v. Mack,* 329 Md. 188, 207, 618 A.2d 744, 753 (1993) (requiring clear and convincing evidence for the withdrawal of life-sustaining medical treatment); *Owens–Illinois v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992) (requiring the clear and convincing evidence standard for proof of punitive damages); *Everett v. Baltimore Gas & Elec.,* 307 Md. 286, 301, 513 A.2d 882, 889 (1986) (requiring utility to prove sufficient grounds for termination of service by clear and convincing evidence); *Wash. Co. Dep't Soc. Serv. v. Clark,* 296 Md. 190, 192, 461 A.2d 1077, 1078 (1983) (requiring proof of parental unfitness by clear and convincing evidence in order to terminate parental rights); *Coard v. State,* 288 Md. 523, 525, 419 A.2d 383, 384 (1980) (requiring proof by clear and convincing evidence in civil commitment proceedings); *Berkey v. Delia,* 287 Md. 302, 318, 413 A.2d 170, 178 (1980) (requiring the heightened evidentiary standard of clear and convincing evidence for libel and slander).

I have a hard time reconciling the fact that a utility must prove nonpayment by clear and convincing evidence in order to shut off a consumer's gas and electric service, while the

determination of the imposition of the ultimate penalty of death can be made by a preponderance of the evidence, with the basic notions of justice at the core of our fundamental fairness jurisprudence.

As Justice Stewart of the Utah Supreme Court eloquently opined in his concurring opinion in *State v. Brown*, 607 P.2d 261 (Utah 1980):

> "The 'beyond a reasonable doubt' standard may, of course, be considered similar in its function to proof by a preponderance of evidence, i.e., both standards are used to resolve factual disputes. However, the term 'beyond a reasonable doubt' is something more than a standard for evaluating conflicting facts and inferences; in the context of a penalty hearing, it also conveys to the jury the concept that the values upon which the criminal justice system is built do not permit the ultimate sanction to be imposed unless the conclusion is free of substantial doubt."

*Id.* at 275. I could not agree more.

There are only two states in this country that permit the imposition of the death penalty based on a preponderance of the evidence standard. Evolving standards of decency cry out that, if a society is to impose death as a penalty, it should do so on no less a standard than beyond a reasonable doubt that the sentence is fitting and appropriate for the particular offender.

## IV. Severability

Although I find that the preponderance of the evidence standard in § 413(h) is invalid, that standard is clearly severable from the remainder of the Maryland death penalty statute. As this Court has emphasized, "[t]here is a strong presumption that if a portion of an enactment is found to be invalid, the [legislative] intent is that such portion be severed." *Board v. Smallwood*, 327 Md. 220, 245, 608 A.2d 1222, 1234 (1992), and cases there cited. *See Montrose Christian v. Walsh*, 363 Md. 565, 770 A.2d 111 (2001).

Moreover, the General Assembly has mandated that statutes are severable unless they specifically provide to the contrary or unless the remaining valid portions are "incomplete and incapable of being executed in accordance with the legislative intent." Maryland Code (1957, 1998 Repl.Vol., 2001 Supp.), Art. 1, § 23. *See Migdal v. State,* 358 Md. 308, 323, 747 A.2d 1225 (2000).

The other basic test for severability under our cases is "that '[w]hen the dominant purpose of an enactment may largely be carried out notwithstanding the [enactment's] partial invalidity, courts will generally hold the valid provisions severable and enforce them.'" *Smallwood,* 327 Md. at 246, 608 A.2d at 1235 (quoting *O.C. Taxpayers v. Ocean City,* 280 Md. 585, 601, 375 A.2d 541, 550 (1977)).

Clearly, the Maryland death penalty statute is complete and capable of being enforced with the preponderance of the evidence standard severed from § 413(h). That standard would, under the requirements of due process, be replaced by the standard of beyond a reasonable doubt. Furthermore, the dominant purpose of the Maryland death penalty statute was obviously not the application of a preponderance of the evidence standard for the weighing process under § 413(h). Rather, the dominant purpose was to authorize the death penalty for the most heinous first degree murders.

Thus, I would sever the preponderance of the evidence standard from § 413(h), vacate appellant's death sentence, and remand the case for a new capital sentencing proceeding at which a reasonable doubt standard would apply to the weighing process under § 413(h).

Accordingly, I respectfully dissent from the majority's decision holding that § 413(h) of Maryland's capital punishment law does not violate due process by allowing the State to prove that the aggravating circumstances outweigh the mitigating circumstances by a mere preponderance of the evidence.

Chief Judge BELL and Judge ELDRIDGE join in this dissenting opinion.